**UNITED STATES of America**

v.

**STATE OF MARYLAND;  and Louis L. Goldstein, Comptroller of the Treasury of the State of Maryland.**

**Civ. No. K–78–1287.**

United States District Court, D. Maryland.

March 31, 1980.

Russell T. Baker, Jr., U. S. Atty. and Gale E. Rasin, Asst. U. S. Atty., Baltimore, Md., M. Carr Ferguson, John J. McCarthy, William L. Shraberg, Attys., Tax Division, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Stephen H. Sachs, Atty. Gen. of Maryland, Baltimore, Md., Gerald I. Langbaum, and Richard E. Israel, Asst. Attys. Gen., Annapolis, Md.; for defendants.

FRANK A. KAUFMAN, District Judge.

Can a Member of Congress who represents a state other than Maryland and who

maintains an abode in Maryland so that he can perform his duties in Washington, D. C. be subjected to individual income taxation imposed by Maryland and/or its political subdivisions in contravention of 4 U.S.C. § 113? The United States says "No"; Maryland and its Comptroller of the Treasury say "Yes." [1]

On July 19, 1977, the following statute, now codified as 4 U.S.C. § 113, became law and provides in relative part:

### § 113. Residence of Members of Congress for State income tax laws

(a) No State, or political subdivision thereof, in which a Member of Congress maintains a place of abode for purposes of attending sessions of Congress may, for purposes of any income tax (as defined in section 110(c) of this title) levied by such State or political subdivision thereof—

(1) treat such Member as a resident or domiciliary of such State or political subdivision thereof; or

(2) treat any compensation paid by the United States to such Member as income for services performed within, or from sources within, such State or political subdivision thereof,

unless such Member represents such State or a district in such State. [2]

That statute prohibits *any* state in which a Member of Congress maintains an abode for purposes of attending to his duties in Washington, D. C., from imposing a state or local income tax on such Member. The practical effect, however, of that legislation is narrowly focused upon Maryland, Virginia and the District of Columbia since geographical considerations virtually require that Members of Congress maintain places of abode in or near the metropolitan area of Washington, D. C., *i. e.*, either the District of Columbia, Virginia or Maryland. Both the District of Columbia and Virginia, by their own respective legislative enactments, presently exempt Members of Congress, representing jurisdictions other than Virginia and the District of Columbia respectively, who maintain abodes within their respective borders from state and local income taxes. [3] Accordingly, the 1977 federal legislation, in reality, affects only Maryland. [4]

The facts and the relevant provisions of Maryland's income tax laws are not in dispute, and can be summarized as follows:

1. Every "resident" of Maryland is subject to state individual income taxation on his taxable net income. [5]

2. The term "resident" means ". . . an individual domiciled in this State on the last day of the taxable year, and every other individual who, for more

---

1. The Comptroller administers the provisions of Maryland law relative to imposition, assessment, and collection of Maryland state and local individual income taxes. Md.Ann.Code, Art. 81, § 304.

2. That 1977 enactment was not the first attempt by Congress to exempt its Members from income taxation by states other than the states from which they were elected. In 1975, bills embodying provisions virtually identical to those of 4 U.S.C. § 113, were introduced in both Houses of Congress. The Senate bill was passed by both Houses in 1976, but was vetoed by President Ford on August 3, 1976. *See* S.2447 and H.R.8904, 94th Cong., 2nd Sess. The 1977 statute, by its own terms, became "effective with respect to all taxable years, whether beginning before, on, or after the date of the enactment of this Act." *See* Subsection (1)(c) of Public Law 97 67.

3. D.C.Code § 47-1551c; Virginia Code, Sec. 58 151(e)(1)(i).

4. The Senate Report relating to S.2447, the bill introduced in 1976, see n.2, *supra*, states, *inter alia*, as follows:

    Members of Congress who for reasons of distance are required to maintain their abode near the United States Capitol in order to discharge their duties normally do so in the states of Virginia and Maryland or in the District of Columbia.

    The District and the Commonwealth of Virginia both expressly exempt Members of the Congress under their income tax statutes. D.C.Code § 47--551(C)(S), Virginia Code, Sec. 58 151.02(e)(1)(i).

    No similar exemption is provided by the State of Maryland.

    S.Rep. No. 94-631, 94th Cong., 2d Sess. 2 (1976).

5. Md.Ann.Code, Art. 81, § 288(a).

than six months of the taxable year, maintained a place of abode within this State, whether domiciled in this State .or not; . . ."[6]

3. Each of Maryland's political subdivisions is required to adopt a local income tax calculable as a percentage of the State income tax.[7]

4. Those local income taxes are administered and collected by the Comptroller of the Treasury. The State, upon collection of such taxes, remits the same to the political subdivision which has levied the tax.[8]

5. Md.Ann.Code, Art. 81, § 290, provides:

### Credit allowed residents.

(a) Whenever a resident individual of this State has become liable for income tax to another state upon such part of his net income for the taxable year as is properly subject to taxation in such state, the amount of income tax payable by him under this subtitle shall be reduced by the amount of the income tax so paid by him to such other state upon his producing to the Comptroller satisfactory evidence of the fact of such payment; but application of such credit shall not operate to reduce the tax payable under this subtitle to an amount less than would have been payable if the income subjected to tax in such other state were ignored. The credit provided for by this section shall not be granted to a taxpayer when the laws of such other state allow a credit to such taxpayer substantially similar to that granted by § 291 hereof.

(b) Notwithstanding the aforegoing, with respect to the taxable year 1974 and each taxable year thereafter, the credit provided for by this section operates to reduce only the State income tax payable under this subtitle and does not operate to reduce any local income tax imposed under § 283 of this article.

6. Md.Ann.Code, Art. 81, § 291, provides in relevant part:

### Credit against tax allowed nonresidents.

(a) *When allowed; amount.*—Whenever an individual not a resident of this State has become liable for income tax to the state where he resides upon his income for the taxable year including that taxable in this State, the amount of income tax payable by him under this subtitle shall be credited with such proportion of the tax so payable by him to the state where he resides, as his net income subject to taxation under this subtitle bears to his entire income upon which the tax so payable to such other state was imposed; but such credit shall be allowed only if the laws of said state (i) grant a substantially similar credit to residents of this State subject to income tax under such laws, or (ii) *impose a tax upon the income of its residents subject to taxation in this State and exempt from taxation the income of residents of this State. No credit shall be allowed against the amount of the tax on any income taxable under this subtitle which is exempt from taxation under the laws of such other state.

7. "[L]ocal income tax," as that term is used in Section 290(b), refers to those local income taxes which are required by Section 283(a).

8. Defendants maintain—and it is so assumed *arguendo* in this opinion—that any Member of Congress who maintains a place of abode within Maryland for more than six months of a given taxable year is a "resident" of Maryland pursuant to § 279(i) and, thus, is subject to Maryland and local income taxes for that taxable year.

9. Following the 1977 federal enactment, and prior to the institution of the within case, several Members of Congress who maintain abodes in Maryland but who represent states other than Maryland filed claims with the Comptroller seeking refunds of taxes paid. All such refund claims were denied by the Comptroller on the basis that the 1977 federal statute constitutes an unconstitutional intrusion by the federal

**6.** Md.Ann.Code, Art. 81, § 279(i).

**7.** Md.Ann.Code, Art. 81, § 283(a).

**8.** Md.Ann.Code, Art. 81, § 283(c).

government into the reserved taxing powers of the states.

10. Thereafter, pursuant to Md.Ann. Code, Art. 81, §§ 229 and 310, at least several of those Members of Congress appealed those denials to the Maryland Tax Court. One of those appeals was noted in November 1977; another in July 1978. During February 1980, following the institution of this case, counsel for those appellants requested the Maryland Tax Court to continue those cases on its docket pending this Court's disposition of the within action. The Maryland Tax Court seemingly has in fact stayed those cases.[9]

11. Several non-Maryland Members of Congress, including the two whose appeals are presently pending before the Maryland Tax Court, have paid state and local income taxes to Maryland.[10] Certain other non-Maryland Members of Congress who maintain Maryland abodes have seemingly not paid such taxes.

## VALIDITY OF THE 1977 ACT

It has long been held that the federal government and its properties, functions, and instrumentalities enjoy implied constitutional immunity from state taxation. In *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), the Supreme Court held that a state may not, through regulation or taxation, interfere with an instrumentality chosen by Congress to exercise the powers vested in the federal government by the Constitution. *McCulloch* involved a stamp tax imposed by Maryland on bank notes issued by "any Bank . . . established without authority from the State." The only such bank in Maryland was the Baltimore branch of the Bank of the United States, a corporation created and chartered by Act of Congress. Mr. Chief Justice Marshall, writing for a unanimous Court, noted that Congress had created national banks to carry out one or more of the federal government's enumerated constitutional functions. However, he also noted the importance of the taxing power of each of the states:

\* \* \* It is admitted that the power of taxing the people and their property is essential to the very existence of govern-

9. Herein, the United States seeks not only injunctive and declaratory relief which will require the State of Maryland to cease and desist from collecting income taxes from Members of Congress, but also an Order of this Court requiring the refund of those taxes collected by Maryland in contravention of the 1977 law. Because those refund claims pose Eleventh Amendment, retroactively, and other issues unrelated to the question of validity of the 1977 legislation, the parties have asked—and this Court has agreed—to permit the refund question to be presented at a later date. Accordingly, the issues relating solely to the refund relief sought by the United States herein are not reached in this opinion and are separated by this Court, pursuant to Federal Civil Rule 42(b), in an Order entered today from the issues relating to the injunctive and declaratory relief sought herein by the United States. Whether or not it will be necessary for this Court to reach, at a subsequent time, the refund issues may depend upon the results of the Maryland Tax Court litigation.

Defendants have initially argued that, even if the United States possesses standing to maintain this case, see p. 360 *et seq., infra,* this Court should abstain under the principles enunciated in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny because of the pendency of the aforesaid appeals to the Maryland Tax Court. However, during a hearing in this case on November 9, 1978, counsel for defendants indicated that, in view of the substantial backlog of cases in the Maryland Tax Court, defendants were no longer pressing that *Younger* abstention argument.

If, hereafter, this Court's within grant of injunctive and declaratory relief becomes final, it may well be that result will cause the Maryland Tax Court to grant the refunds sought in the proceedings before it and/or cause the Comptroller of the Treasury of the State of Maryland to make refunds to those Members of the Congress affected by this opinion, perhaps regardless of whether or not they have refund claims pending before the Comptroller or the Maryland Tax Court. However, if all refund claims sought herein are not disposed of in a manner satisfactory to the United States, the United States will be given the opportunity timely to seek refund relief in this Court. As of this time, this Court is today entering a final Judgment Order pursuant to Federal Civil Rule 54(b) as to the validity of the 1977 federal legislation and the within grant of injunctive and declaratory relief and is separating and staying the refund issues as indicated *supra.*

10. *See* n.9 *supra.*

ment, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation.

The people of a state, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representative, to guard them against its abuse. Id. at 428.

Continuing, the Chief Justice wrote:

But the means employed by the government of the Union have no such security, nor is the right of a state to tax them sustained by the same theory. Those means are not given by the people of a particular state, not given by the constituents of the legislature, which claim the right to tax them, but by the people of all the states. They are given by all, for the benefit of all—and upon theory, should be subjected to that government only which belongs to all. Id. at 428–29.

\*    \*    \*    \*    \*    \*

[W]hen a state taxes the operations of the government of the United States, it acts upon institutions created, not by their own constituents, but by people over whom they claim no control. It acts upon the measures of a government created by others as well as themselves, for the benefit of others in common with themselves. Id. at 435.

■ Thus, where an instrumentality of the federal government has been created by

Congress for the benefit of all and where Congress has determined that the efficient operation of that instrumentality affects the interests of all, the power to tax or control that instrumentality cannot be left to the legislature of one or more of the states:

In the legislature of the Union alone, are all represented. The legislature of the Union alone, therefore, can be trusted by the people with the power of controlling measures which concern all, in the confidence that it will not be abused. Id. at 431.

\*    \*    \*    \*    \*    \*

The court has bestowed on this subject its most deliberate consideration. The result is a conviction that the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared. Id. at 436.[11]

In the years since *McCulloch*, the Supreme Court has further defined the scope of the federal government's immunity from state taxation and has recognized that Congress possesses an implied constitutional power to grant express tax immunity to its instrumentalities, agents, or contractors where Congress deems such immunity necessary for the carrying out of certain of its enumerated constitutional powers. In *Graves v. New York*, 306 U.S. 466, 478, 59 S.Ct. 595, 597, 83 L.Ed. 927, 932 (1939), Mr. Justice Stone wrote:

[T]he federal government is one of delegated powers in the exercise of which Congress is supreme; so that every agency which Congress can constitutionally create is a governmental agency. And

---

11. The Supremacy Clause, which is found in Article VI, Cl. 2 of the Constitution, provides as follows:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

**352**

since the power to create the agency includes the implied power to do whatever is needful or appropriate, if not expressly prohibited, to protect the agency, there has been attributed to Congress some scope, the limits of which it is not now necessary to define, for granting or withholding immunity of federal agencies from state taxation. * * *

The scope of this Congressional power to grant tax exemptions as an incident to the exercise of authority specifically granted by the Constitution has seemingly never been specifically limited, if it is indeed capable of the same. However, the case law does suggest that where Congress has determined that an express tax exemption is necessary to further the exercise of one of its constitutional functions, that determination is to be afforded great deference by the courts. Professor Tribe has put it this way in his treatise on Constitutional law:

In those rare cases where Congress has expressly granted or withheld regulatory or tax immunity to certain of its instrumentalities, agents, or contractors, the validity or invalidity of state action is definitively settled by such federal legislation. L. Tribe, *American Constitutional Law*, § 6–28, at 391.

· In *City of Cleveland v. United States*, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274 (1944), the United States sought to enjoin local officials in the state of Ohio from attempting to assess and collect state taxes on lands acquired by condemnation by the Federal Public Housing Authority which Congress had created in order to assist the states and their political subdivisions in the erection of low-cost dwelling units. Congress had expressly exempted that Authority, including its capital, income, assets, and property, from all federal, state, and local taxation. 42 U.S.C. §§ 1401, 1405(e). In upholding Congress' power to exempt the property in question from taxation, Mr. Justice Roberts stated:

Challenge of the power of Congress to enact the Housing Act must fail. And Congress may exempt property owned by the United States or its instrumentality from state taxation in furtherance of the purposes of the federal legislation. This is settled by such an array of authority that citation would seem unnecessary. [Footnotes omitted.] 323 U.S. at 333, 65 S.Ct. at 282.[12]

*Carson v. Roane-Anderson Co.*, 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257 (1952), involved Tennessee use and sales taxes on articles used by certain contractors in performing their contracts with the Atomic

12. In *Pittman v. Home Owners' Loan Corp.*, 308 U.S. 21, 60 S.Ct. 15, 84 L.Ed. 11 (1939), Maryland attempted to assess its mortgage recording tax upon a mortgage executed to the Home Owners' Loan Corporation in the face of 12 U.S.C. §§ 1461, 1463 in which Congress expressly declared the Corporation to be an instrumentality of the United States and explicitly exempted its capital, loans, and income from all state or municipal taxes. The Corporation successfully prosecuted its mandamus suit to require the Clerk of the Superior Court of Baltimore to record the Corporation's mortgage without affixing stamps for the state recording tax. Rejecting Maryland's contention that Congress had exceeded its constitutional power in exempting the Corporation from the non-discriminatory Maryland tax, Mr. Chief Justice Hughes stated (at 32–33, 60 S.Ct. at 18):

Congress has not only the power to create a corporation to facilitate the performance of governmental functions, but has the power to protect the operations thus validly authorized. "A power to create implies a power to preserve." *McCulloch v. Maryland*, supra (4

Wheat. p. 426, 4 L.Ed. 606). This power to preserve necessarily comes within the range of the express power conferred upon Congress to make all laws which shall be necessary and proper for carrying into execution all powers vested by the Constitution in the Government of the United States. Const. Art. 1, § 8, par. 18. In the exercise of this power to protect the lawful activities of its agencies, Congress has the dominant authority which necessarily inheres in its action within the national field. [Citation omitted.] * * * In this instance, Congress has undertaken to safeguard the operations of the Home Owners' Loan Corporation by providing the described immunity. As we have said, we construe this provision as embracing and prohibiting the tax in question. Since Congress had the constitutional authority to enact this provision, it is binding upon this Court as the supreme law of the land.
See also, *Federal Land Bank v. Bismarck Lumber Company*, 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65 (1941).

Energy Commission. Congress had expressly exempted "the Commission and [its] property, activities, and income" from all state and local taxation. 42 U.S.C. § 1809. Mr. Justice Douglas held the taxes invalid, concluding that the contracts which the contractors had with the federal government, and the performance thereunder, were "activities" of the Commission within the meaning of the federal statute. Mr. Justice Douglas had little difficulty in upholding the Congressionally-authorized tax immunity:

> The constitutional power of Congress to protect any of its agencies from state taxation [citations omitted] has long been recognized as applying to those with whom it has made authorized contracts. [Citations omitted.] Certainly the policy behind the power of Congress to create tax immunities does not turn on the nature of the agency doing the work of the government. The power stems from the power to preserve and protect functions validly authorized [citations omitted]— the power to make all laws necessary and proper for carrying into execution the powers vested in the Congress. 342 U.S. at 233–34, 72 S.Ct. at 258.

The Soldiers' and Sailors' Civil Relief Act of 1940, as amended, 50 U.S.C.App. § 501, *et seq.* and particularly § 574,[13] provides that, for purposes of taxation, a member of the military services does not lose his residence or domicile in any state solely by reason of being absent therefrom in compliance with military orders, and shall not be deemed to have acquired a residence or domicile in any state to which he happens to be assigned to duty merely because of his presence in that state and his absence from his original residence or domicile. That law further expressly provides that a serviceman's compensation for military or naval service "shall not be deemed [to be] income for services performed within, or [derived] from sources within," any state of which the serviceman is not a resident or domiciliary; and that a serviceman's "personal property shall not be deemed to be located or present in or to have a situs for taxation in" any state, other than the state of his own domicile, because he is living in such state in order to perform his military duty. In *Dameron v. Brodhead*, 345 U.S. 322, 73 S.Ct. 721, 97 L.Ed. 1041 (1953), an Air Force officer who was a resident and domiciliary of Louisiana was assigned to military duty in Colorado. When Colorado assessed taxes on the personal property in his Denver apartment, the officer paid the tax under protest and then brought a refund suit, alleging that such application of the Colorado tax was forbidden by the federal statute. Rejecting Colorado's contention that the federal statute was unconstitutional, Mr.

---

**13.** *See* Footnote on p. 12A.

50 U.S.C. App. § 574 provides in relevant part:

**Residence for tax purposes**

(1) For the purposes of taxation in respect of any person, or of his personal property, income, or gross income, by any State, Territory, possession, or political subdivision of any of the foregoing, or by the District of Columbia, such person shall not be deemed to have lost a residence or domicile in any State, Territory, possession, or political subdivision of any of the foregoing, or in the District of Columbia, solely by reason of being absent therefrom in compliance with military or naval orders, or to have acquired a residence or domicile in, or to have become resident in or a resident of, any other State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia, while, and solely by reason of being, so absent. For the purposes of taxation in respect of the personal property, income or gross income of any such person by any State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia, of which such person is not a resident or in which he is not domiciled, compensation for military or naval service shall not be deemed income for services performed within, or from sources within, such State, Territory, possession, political subdivision, or District, and personal property shall not be deemed to be located or present in or to have a situs for taxation in such State, Territory, possession, or political subdivision, or district. Where the owner of personal property is absent from his residence or domicile solely by reason of compliance with military or naval orders, this section applies with respect to personal property, or the use thereof, within any tax jurisdiction other than such place of residence or domicile, regardless of where the owner may be serving in compliance with such orders * * *.

Justice Reed, for a majority of seven, wrote (at 324–325, 73 S.Ct. at 723):

The constitutionality of federal legislation exempting servicemen from the substantial burdens of seriate taxation by the states in which they may be required to be present by virtue of their service, cannot be doubted. Generally similar relief has often been accorded other types of federal operations or functions. And we have upheld the validity of such enactments, even when they reach beyond the activities of federal agencies and corporations to private parties who have been seen fit to contract to carry on functions of the Federal Government. *Carson v. Roane-Anderson Co.*, 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257, and cases cited; cf. *James v. Dravo Contracting Co.*, 302 U.S. 134, 160, 161, 58 S.Ct. 208, 221, 82 L.Ed. 155 [172, 173] [114 A.L.R. 318].

Nor do we see any distinction between those cases and this. Surely, the respondents may not rely on the fact that petitioner here is not a business contractor. He is not the less engaged in a function of the Federal Government merely because his relationship is not entirely economic. We have, in fact, generally recognized the especial burdens of required service with the armed forces in discussing the compensating benefits Congress provides. *Le Maistre v. Leffers*, 333 U.S. 1, 68 S.Ct. 371, 92 L.Ed. 429; *Boone v. Lightner*, 319 U.S. 561, 63 S.Ct. 1223, 87 L.Ed. 1587. Cf. *Board of County Commissioners v. Seber*, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094. Petitioner's duties are directly related to an activity which the Constitution delegated to the national government, that "to declare War," U.S. Const. Art. 1, § 8, cl. 11, and "to raise and support Armies." Ibid., cl. 12. Since this is so, congressional exercise of a "necessary and proper" supplementary power such as this statute must be upheld. *Pittman v. Home Owners' Loan Corp.*, 308 U.S. 21, 32, 33, 60 S.Ct. 15, 17, 18, 84 L.Ed. 11 [16, 17] [124 A.L.R. 1263]; *Federal Land Bank v. Bismarck Co.*, 314 U.S. 95, 102–104, 62 S.Ct. 1, 5–6, 86 L.Ed. 65

[71, 72]; *Carson v. Roane-Anderson Co.*, supra, 342 U.S. at 234, 72 S.Ct. at 258. What has been said in no way affects the reserved powers of the states to tax. For this statute merely states that the taxable domicile of servicemen shall not be changed by military assignments. This we think is within the federal power.

Speaking for himself and Mr. Justice Black, Mr. Justice Douglas dissented, noting that the "power to tax is basic to the sovereignty of the states" and concluding that the "creation of islands of tax immunity [by Congress] should therefore be sparingly made." 345 U.S. at 329, 73 S.Ct. at 725. While he recognized that Congress has the power to exempt a federal instrumentality and its functions from state taxation or regulation in order to protect and preserve that instrumentality, Mr. Justice Douglas concluded that that Congressional power does not extend to the granting of tax immunity to a federal employee in his private capacity:

* * * The power of Congress to *withhold* tax immunity is clear. But to date the power of Congress to *create* a tax immunity has been narrowly confined. It stems from "the power to preserve and protect functions validly authorized." See *Carson v. Roane-Anderson Co.*, 342 U.S. 232, 234, 72 S.Ct. 257, 258, 96 L.Ed. 257 [261]. Up to the present the Court has never held that the *private* affairs of a federal employee can be made *public* affairs by Congress and immune from state taxation. The question was indeed reserved in *Graves v. New York*, supra 306 U.S. [466] at 478, 479 [59 S.Ct. 595 at 597, 83 L.Ed. 927]. As Mr. Justice Frankfurter stated in his concurring opinion, id., 306 U.S. at 492, 59 S.Ct. at 604, "Whether Congress may, by express legislation, relieve its functionaries from their civic obligations to pay for the benefits of the State governments under which they live is a matter for another day."

The federal property used by the soldier, his activities as a federal employee, every phase of the functions he performs

for the Army are immune from state taxation because his work is the work of the national government. But the wages that he makes, as *Graves v. New York* (US) supra, held, can be taxed on a non-discriminating basis by the states. So can his real and personal property. For in his private capacity a federal employee is no different from any other citizen. He receives protection and benefits from the society which the states create and maintain. Their police, their courts, their parks, their sanitary districts, their schools are all part of the civilization which he enjoys. If he gets tax immunity, it means that other citizens must pay his share.

The Court does not profess to go so far. It merely says that this case turns on changing military assignments and the burden placed on service men and women as a result of that feature of their work. But we also know that service men and women receive salaries much lower than those earned in civilian life. Can Congress remove those salaries from the reach of state taxing officials because they are burdensome to our military personnel? Certainly the burden, the harassment, the unpleasantness of those taxes would be as easy to establish as the burden of the present tax. And the relation of the burden to the federal service would be as close and intimate in one case as in the other.

The private affairs of our military personnel—the disposition of their salary, the furniture they purchase, the apartments they rent, the personal contracts that they make—by the very definition are not in the federal public domain. When Congress undertakes to protect them from state taxation or regulation, it is not acting to protect either a federal instrumentality or any function which a federal agency performs. Congress, *therefore, acts without constitutional authority.* [Emphases in original.]

The legislative history of the 1977 legislation at issue herein reveals that that statute was modelled after the tax exemption provisions of the Soldiers' and Sailors' Civil Relief Act and that Congress, in drafting the 1977 legislation, intended to afford to Members of Congress the same type of protections that were given to servicemen under the earlier Act:

> The effect of the provisions of this bill would be very similar to that that has been provided for years to servicemen under the Soldiers' and Sailors' Civil Relief Act.

> \*       \*       \*       \*       \*       \*

> [This bill] provides that when an individual is elected to serve in the Congress and his duties require his attendance in Washington to attend the sessions of Congress and to discharge his responsibilities as an elected representative of a State or a district within a State, the Member shall not be held to have acquired a new residence for tax purposes under a State other than the State from which he was elected. This, of course, would only apply during his term of office. Here again, the case of *Dameron v. Brodhead* is instructive because the Court in that case noted that similar provisions of the Soldiers' and Sailors' Civil Relief Act "saved the sole right of taxation to the State of original residence". The Court further noted that other than this, the statute does not alter the benefits and burdens of our system of dual federalism during the individual's service. This bill \*    \* provides for such an effect in that it makes it clear that the member will not be relieved of his tax obligations as regards the State from which the member was elected.

H.R.Rep. No. 95–377, 95th Cong., 1st Sess. 3–4, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 468, 470.

*Dameron* involved the constitutional grant to Congress of plenary power "to declare War," Art. I, § 8, Cl. 11, and "to raise and support Armies." *Id.*, Cl. 12. Observing that a serviceman's duties are directly "related to those Congressional" powers, Mr. Justice Reed stated (at 325, 73 S.Ct. at 723):

Since this is so, congressional exercise of a "necessary and proper" supplementary power such as this statute must be upheld. * * *

In enacting the Soldiers' and Sailors' Civil Relief Act of 1940, Congress seemingly determined that if a state in which a serviceman was stationed on military duty were permitted to tax the property or income of that serviceman, the tax would impose not only a burden on the serviceman but also an unwarranted burden on the federal government and would impinge on Congress' power to provide for the common defense. In *Dameron*, the Supreme Court does not appear to have made any specific inquiry into the reality of that perceived burden but rather appears to have impliedly recognized that it is up to Congress, and not the courts, to determine what legislation is "necessary and proper." Art. 1, § 8, Cl. 18. Indeed, it would seem to be that deference to Congress, grounded on principles of separation of powers, that has provided the cornerstone for the standard for judicial review of federal legislative action such as the 1977 Act. As Mr. Chief Justice Marshall put it in *McCulloch* in construing the "necessary and proper" clause:

Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional. 17 U.S. (4 Wheat.) at 421.

The Supreme Court, in adhering to that standard over the years, has often refused to look behind Congress' stated purpose in enacting a particular statute and has declined to make its own determination as to whether a piece of legislation is, in fact, "necessary and proper." Again the words of the Chief Justice in *McCulloch* are instructive:

[W]here the law is not prohibited, and is really calculated to effect any of the objects entrusted to the government, to undertake * * * to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. 17 U.S. (4 Wheat.) at 423.

■ In 1977, more than a century and a half after *McCulloch*, Congress, in enacting the statute herein at issue, sought to provide for Members of Congress the same type of protection that had earlier been given to servicemen, *i. e.*, an exemption for those Members of Congress "from the substantial burdens of seriate taxation by the states in which they may be required to be present," *Dameron v. Brodhead*, 345 U.S. at 324, 73 S.Ct. at 723, in order to attend sessions of Congress. That determination must be respected and the constitutionality of the statute must be upheld, if it is shown that that federal legislation was enacted in furtherance of any of the powers entrusted to the federal government, either expressly or impliedly, by the Constitution.

Article I, § 1 of the Constitution provides that all legislative powers therein granted "shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." The Constitution further provides that the Senate and House shall be composed of members elected by the people of the several states.[14] It goes almost without saying that the duties of each Member of Congress are directly related to all of the activities which the Constitution has delegated to the legislative branch of the federal government. Accordingly if Congress determines that taxes such as the Maryland taxes in question impose an undue burden on the federal government and thus impede Congress' ability effectively to execute any or all of its constitutional powers, Congress possesses the power under the Constitution to enact whatever reasonably related legislation it deems "necessary and proper" in order to

14. Article I, § 2, Cl. 1 of the Constitution provides, in relevant part: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States * * *."

The 17th Amendment to the Constitution provides, in relevant part: "The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; * * *."

alleviate that substantial burden and to enable it thereby to carry into execution its constitutional powers. In *McCulloch*, in which Mr. Chief Justice Marshall noted the absence of any specific grant of power by the Constitution to establish national banks, he also wrote:

> Although, among the enumerated powers of government, we do not find the word "bank" or "incorporation," we find the great powers to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies. The sword and the purse, all the external relations, and no inconsiderable portion of the industry of the nation, are entrusted to its government. It can never be pretended that these vast powers draw after them others of inferior importance, merely because they are inferior. Such an idea can never be advanced. But it may with great reason be contended, that a government, entrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be entrusted with ample means for their execution. The power being given, it is the interest of the nation to facilitate its execution. It can never be their interest, and cannot be presumed to have been their intention, to clog and embarrass its execution by withholding the most appropriate means. 17 U.S. (4 Wheat.) at 407–08.

Thus, if the 1977 law is an exercise by Congress of power to aid itself in the performance of its own duties, the statute's validity is well supported by long standing Supreme Court doctrine. But it has been suggested by defendants that the 1977 statute, rather than being directed to the efficient functioning of Congress, is bottomed on a Congressional desire to aid Members of Congress as individuals and to enable them to enjoy the benefits of the parks, schools, sanitary services, etc., of a state, such as Maryland, without contributing their fair share to the financing of those services. The answer to that suggestion is that it can hardly be said that Congress' determination to grant the 1977 tax exemption was or is unreasonable or without foundation in terms of aiding the functioning of Congress itself. When an individual is elected to serve in Congress, he must maintain an abode either in the District of Columbia or close enough to it to enable him to work a full schedule in Washington, D. C. and thus bear his full proportionate burden as one of the elected Members of Congress. As is the case with the Soldiers' and Sailors' Civil Relief Act, the 1977 statute does not relieve Members of Congress of their tax obligations in their "home" states. Rather, that legislation relieves a Member of Congress from taxation by a state, other than his own, in which he maintains an abode so that he can live there while he is in Washington engaged in his legislative work.

It is also to be noted that if the Maryland income tax is assessed on a non-Maryland Member of Congress who maintains a place of abode in Maryland in order to attend sessions of Congress, such Member might be subjected to taxation by more than one state. It is true that such Member would, under Maryland law, be entitled to a tax credit for taxes paid to his "home" state.[15] However, he would still be taxed by his home state and also by Maryland to the extent that the Maryland income tax rates exceed those of his home jurisdiction. Further, in any event, the Maryland income tax credit does not apply to local income taxes [16] which the counties of Maryland are required to impose under state law.[17] The legislative history of the predecessor bill, which was passed in 1976 but vetoed by President Ford,[18] evidenced a concern on the part of Congress that such potential cumulative taxation would impose a significant burden on a Member of Congress and

---

**15.** *See* Md.Ann.Code, Art. 81, § 290(a), *supra* p. 4.

**16.** *See* Md.Ann.Code, Art. 81, § 290(b), *supra* p. 4.

**17.** *See* Md.Ann.Code, Art. 81, § 283(a).

**18.** *See* n.2 *supra.*

might, ultimately, serve to deter "persons of limited means" from running for Congress.[19]

Defendants suggest that a Member of Congress can easily avoid any such potential cumulative taxation by living in Virginia or the District of Columbia, both of which jurisdictions presently exempt Members of Congress from their respective income tax laws.[20] However, an otherwise valid Congressional statute is seemingly not rendered invalid simply because the practical impact of the legislation falls on only one or a few states.[21] In addition, the present Virginia tax exemption is in and of itself a matter of grace, and thus, absent the federal statute, Virginia would remain free, like Maryland, to impose income taxes on Members of Congress.

At the core of this case, as in all cases involving questions of inter-governmental tax immunity, lies the fundamental issue of how best to reconcile competing claims of the state and federal governments. The smooth functioning of our federal system of government requires that some national body be entrusted with the responsibility of making what are often difficult decisions as to when to confer tax immunity, thereby narrowing the states' revenue base, and as to when to withhold such immunity, even to the extent of allowing states to tax the properties and instrumentalities of the federal government. As Chief Justice Marshall recognized in *McCulloch*, it is Congress, whose Members represent both national and state interests, upon whom the Constitution has imposed the duty of balancing such interests.[22] In *United States v.*

**19.** The Senate Report accompanying the bill S.2447 stated, in part:

To subject members of Congress to local income taxes because of their abode in a state near the Capitol is to subject them, in most cases, to double taxation as a result of their constitutional functions and duties. They are required constitutionally to be and remain citizens of the states they represent, and to be subject to taxes as citizens of their home states. If the Maryland statute were applicable, they would be required additionally to pay taxes to Maryland. In accord with this view, this would deny them due process and equal protection of the laws.

&ast; &ast; &ast; &ast; &ast; &ast;

It may be contended that since Maryland recognizes a credit for taxes paid to other states, most of double taxation is obviated. There are several responses to this fallacious argument. First, to the extent that Maryland taxes are at a higher rate than home state taxes, there is double taxation in the amount of the excess. Second, the recent Maryland statute indicates an intention to allow only a partial credit. Thus, Maryland's top tax bracket is 5%, but county taxes may be an additional $2\frac{1}{2}$%. A Senator or Representative from a state imposing a 10% income tax will pay an aggregate $12\frac{1}{2}$% tax. A Senator or Representative from a home state imposing a 3% tax will pay an aggregate tax of $7\frac{1}{2}$%. A Senator or Representative from a home state imposing a 6% tax will pay an $8\frac{1}{2}$% tax.

Finally, it should be noted that the interstate credit depends on reciprocity, and is, in any event, a matter of grace. As Maryland has recently provided with respect to so-called county taxes, the credit can be partially or wholly eliminated, leading to complete double taxation.

&ast; &ast; &ast; &ast; &ast; &ast;

Finally, while the problem we are considering is relatively discrete at the present time because Maryland income taxes are fairly low, nothing prevents the State from increasing its rate to as high a range as it pleases. Under circumstances of very high rates, double taxation of members of Congress could lead to making Congressional positions untenable for persons of limited means. In this sense, a free-handed power to impose double taxes is indeed, as Chief Justice Marshall observed in the *McCulloch* case, the "power to destroy." What would be destroyed, of course, would be the equal opportunity for persons of limited means, as well as those of great means, to become members of Congress. The "door of this part of the federal government" heretofore "open to merit of every description . . . without regard to poverty or wealth" would be closed. *The Federalist*, No. 52; *cf. Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (forbidding large filing fees from barring candidates for public office); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

S.Rep. No. 94–631, 94th Cong. 2d Sess. 7–8.

**20.** *See* notes 3 and 4, *supra.*

**21.** *Cf. South Carolina v. Katzenbach*, 383 U.S. 301, 329–30, 86 S.Ct. 803, 819, 15 L.Ed.2d 769 (1966).

**22.** *See* Wechsler, "The Political Safeguards of Federalism: The Role of the States in the Com-

*Detroit,* 355 U.S. 466, 474, 78 S.Ct. 474, 479, 2 L.Ed.2d 424 (1958), Mr. Justice Black writing for the majority observed:

> Today the United States does business with a vast number of private parties. In this Court the trend has been to reject immunizing these private parties from nondiscriminatory state taxes as a matter of constitutional law. Cf. *Penn Dairies v. Milk Control Commission,* 318 U.S. 261, 270, 63 S.Ct. 617, 621, 87 L.Ed. 748, [753]. Of course this is not to say that Congress, acting within the proper scope of its power, cannot confer immunity by statute where it does not exist constitutionally. Wise and flexible adjustment of intergovernmental tax immunity calls for political and economic considerations of the greatest difficulty and delicacy. Such complex problems are ones which Congress is best qualified to resolve.[23]

The United States contends herein that even if Congress had not expressly enacted the 1977 legislation and thereby exempted its Members from the type of taxation Maryland seeks to impose, a Member of Congress would be entitled to assert an implied constitutional immunity from such taxation. *See McCulloch* at 436–37. While it is true that a federal instrumentality may not itself be taxed by a state, the question exists as to whether Members of Congress are individually or collectively one or more federal instrumentalities. In *Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 486, 59 S.Ct. 595, 601, 83 L.Ed. 927 (1939), Mr. Justice Stone concluded that, absent a Congressional statute, the salaries of federal employees may be subject to a non-discriminatory state income tax:

> Assuming, as we do, that the Home Owners' Loan Corporation is clothed with the same immunity from state taxation as the government itself, we cannot say that the present tax on the income of its employees lays any unconstitutional burden upon it. All the reasons for refusing to imply a constitutional prohibition of federal income taxation of salaries of state employees, stated at length in the Gerhardt case, are of equal force when immunity is claimed from state income tax on salaries paid by the national government or its agencies. In this respect we perceive no basis for a difference in result whether the taxed income be salary or some other form of compensation, or whether the taxpayer be an employee or an officer of either a state or the national government, or of its instrumentalities. In no case is there basis for the assumption that any such tangible or certain economic burden is imposed on the government concerned as would justify a court's declaring that the taxpayer is clothed with the implied constitutional tax immunity of the government by which he is employed.[24]

Defendants suggest that the *Graves* decision is controlling in this case and contend that Members of Congress, like federal employees, as opposed to the Congress itself, do not constitute instrumentalities of the federal government. The United States, on the other hand, argues that the *Graves* decision is distinguishable on the ground that Members of Congress collectively are the Congress and that any state or local income tax on a Member of Congress, imposed without the express consent of Congress, is an unconstitutional tax on the federal government itself. In the majority opinion in *Graves,* Mr. Justice Stone several times noted that Congress had not granted an express tax immunity to federal employees, and suggested that, had Congress so legislated, the result in that case *might* have been different. Thus (at 478–79, 480, 59 S.Ct. at 597–598), the Justice wrote:

---

position and Selection of the National Government," 54 Colum.L.Rev. 543 (1954). *See also* L. Tribe, American Constitutional Law § 6–30 (1978).

**23.** *See also, Rohr Aircraft Corp. v. County of San Diego,* 362 U.S. 628, 636, 80 S.Ct. 1050, 1054, 4 L.Ed.2d 1002 (1960).

**24.** *Cf. Helvering v. Gerhardt,* 304 U.S. 405, 58 S.Ct. 969, 82 L.Ed. 1427 (1938) (salaries of employees of a state instrumentality not constitutionally immune from federal income tax).

360

[T]here has been attributed to Congress some scope, the limits of which it is not now necessary to define, for granting or withholding immunity of federal agencies from state taxation. * * *

* * * But Congress has given no intimation of any purpose either to grant or withhold immunity from state taxation of the salary of the [Home Owners' Loan Corporation's] employees, and the Congressional intention is not to be gathered from the statute by implication. * * *

* * * The constitutional immunity *of either government from taxation by the other, where Congress is silent,* has its source in an implied restriction upon the powers of the taxing government.

* * * Silence of Congress implies immunity no more than does the silence of the Constitution. It follows that when exemption from state taxation is claimed on the ground that the federal government is burdened by the tax, *and Congress has disclosed no intention with respect to the claimed immunity,* it is in order to consider the nature and effect of the alleged burden, and if it appears that there is no ground for implying a constitutional immunity, there is equally a want of any ground for assuming any purpose on the part of Congress to create an immunity. [Emphases added.]

And, continuing (at 485, 59 S.Ct. at 601) Mr. Justice Stone commented:

As already indicated, such differences as there may be between the implied tax immunity of a state and the corresponding immunity of the national government and its instrumentalities may be traced to the fact that the national government is one of delegated powers, in the exercise of which it is supreme. Whatever scope this may give to the national government to claim immunity from state taxation of all instrumentalities which it may constitutionally create, and whatever authority Congress may possess as incidental to the exercise of its delegated powers to grant or withhold immunity from state taxation, Congress has not sought in this case to exercise such power. * * *

Concurring (at 492, 59 S.Ct. at 604), Mr. Justice Frankfurter wrote:

* * * Whether Congress may, by *express* legislation, relieve its functionaries from their civic obligations to pay for the benefits of the State governments under which they live is matter for another day. [Emphasis added.]

Congress is our one and only national legislative body. Surely it is a more important federal instrumentality than any agency or corporation which it creates. Thus, the *Graves'* holding that employees of a corporation created by Congress as a federal instrumentality are not impliedly immunized by the Constitution itself from the type of Maryland taxation involved herein does not necessarily mean that the Constitution does not impliedly immunize a Member of Congress. But since Congress has expressly by the 1977 Act provided its Members with such immunity, the question of whether a Member of Congress enjoys such implied constitutional immunity need not be answered herein.

## STANDING

■ The Complaint filed by the United States in this case states: "This action has been requested by members of the United States Congress, and is brought under the direction of the Attorney General of the United States to protect the sovereign rights of the United States."[25] No Member of Congress is joined in this case as a party plaintiff. Defendants contend that the United States lacks standing to institute and maintain this suit, arguing that the only persons who stand to gain or lose from the outcome of this litigation are the State of Maryland and the individual Members of Congress who are subject to the Maryland income taxes. The United States itself, defendants suggest, will not be affected by the outcome of this lawsuit and, thus, cannot allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens

25. Complaint, Par. II.

the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

The 1977 federal statute does not expressly provide the Attorney General of the United States with the authority to file suit on behalf of the United States to enforce the provisions of that statute. However, the United States may, in appropriate circumstances, bring suit even when not expressly authorized so to do by statute.[26] Thus, even without express statutory authority, the United States has been permitted to bring suit on a contract to which it was a party [27] and has been recognized as a proper party plaintiff to bring suit to protect or vindicate a right to property owned by the federal government.[28]

In three opinions handed down in the late 1880's, the Supreme Court expanded this doctrine of implied authority of the United States to bring suit, recognizing the right of the United States to sue to protect not only its own proprietary interests, but also the interests of the public at large. In *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888), the Court upheld the right of the Attorney General, in the absence of any statutory authority, to bring suit to set aside a land patent allegedly obtained by fraud. In so holding, the Court wrote:

> But we are of opinion that since the right of the government of the United States to institute such a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief against an instrument obtained from him by fraud or deceit, or any of those other practices which are admitted to justify a court in granting relief, the government must

show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter. If it be a question of property, a case must be made in which the court can afford a remedy in regard to that property; if it be a question of fraud which would render the instrument void, the fraud must operate to the prejudice of the United States; and if it is apparent that the suit is brought for the benefit of some third party, and that the United States has no pecuniary interest in the remedy sought, and is under no obligation to the party who will be benefited to sustain an action for his use; in short, if there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstances. 125 U.S. at 285–86, 8 S.Ct. at 857.

In *United States v. American Bell Telephone Co.*, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888), the Court relied on its earlier opinion in *San Jacinto* in upholding the right of the United States, again without express statutory authorization, to bring suit to impeach two patents for inventions which had allegedly been fraudulently obtained. Referring specifically to the above quoted portion of the *San Jacinto* opinion, the Court stated (at 367–68, 9 S.Ct. at 97):

> This language is construed by counsel for the appellee in this case to limit the relief granted at the instance of the United States to cases in which it has a direct pecuniary interest. But it is not susceptible of such construction. It was evidently in the mind of the court that the case before it was one where the property

---

**26.** However, the scope of the Attorney General's nonstatutory authority to bring suit has been the subject of much debate and controversy. *See, e. g.*, P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* (2d ed. 1973), at 1301–09; Note, Nonstatutory Executive Authority to Bring Suit, 85 Harv.L.Rev. 1566 (1972).

**27.** *See, e. g., United States v. Tingey*, 30 U.S. (5 Pet.) 115, 121, 8 L.Ed. 66 (1831).

**28.** *See, e. g., Benton v. Woolsey*, 37 U.S. (12 Pet.) 27, 29, 9 L.Ed. 987 (1838). *See also United States v. Gear*, 44 U.S. (3 How.) 120, 11 L.Ed. 523 (1845).

right to the land in controversy was the matter of importance, but it was careful to say that the cases in which the instrumentality of the court cannot thus be used are those where the United States has no pecuniary interest in the remedy sought, and is also under no obligation to the party who will be benefited to sustain an action for his use, and also where it does not appear that any obligation existed on the part of the United States to the public or to any individual. The essence of the right of the United States to interfere in the present case is its obligation to protect the public from the monopoly of the patent which was procured by fraud, and it would be difficult to find language more aptly used to include this in the class of cases which are not excluded from the jurisdiction of the court by want of interest in the government of the United States.

The controversy in *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895) arose out of the Pullman strike in Chicago in 1894. The United States brought suit in federal court seeking to enjoin that strike, alleging a conspiracy on the part of the strikers to obstruct the operations of interstate transportation and the carriage of the mails. The court granted the requested injunction. Subsequently, certain persons who violated that injunction were held in contempt and imprisoned. One of the imprisoned strikers then petitioned for a writ of habeas corpus in the Supreme Court on the ground that the lower court had lacked jurisdiction to enter the injunction. Rejecting that contention, the Supreme Court stated (at 584, 15 S.Ct. at 906):

> We do not care to place our decision upon this ground alone [i. e., property interest in the mail]. Every government, entrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The

obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court. * * * [citing *San Jacinto* and *American Bell Telephone, supra.*]

In a case rather similar to the case at bar, the Fourth Circuit relied on those Supreme Court decisions in upholding the power of the United States to bring suit in the absence of express statutory authority so to do. In *United States v. Arlington County, Commonwealth of Virginia*, 326 F.2d 929 (4th Cir. 1964), the United States and a naval officer brought suit seeking a declaratory judgment that a personal property tax assessed against the officer in contravention of Section 514 of the Soldiers' and Sailors' Civil Relief Act of 1940 was illegal. The suit also sought to enjoin the collection of the tax against the officer and all other members of the armed forces similarly situated. Writing for the Fourth Circuit, Judge Bell noted that the Supreme Court had expressly upheld the constitutionality of the tax exemption provisions of the Soldiers' and Sailors' Civil Relief Act in *Dameron v. Brodhead, supra*. After quoting extensively from *Dameron*, Judge Bell considered whether the United States had standing to bring the suit. Although the naval officer had been named as a plaintiff in the suit, he apparently suffered from some incapacity, not specified in the opinion, which, it is assumed herein *arguendo*, deprived him of standing to maintain the action. Judge Bell concluded that the Attorney General had standing to bring the action on behalf of the officer and other aggrieved servicemen, and seemingly also on behalf of the United States itself:

> * * * Does the allegation of the complaint that the United States brings this action on behalf of Bottomley and other servicemen in order to obtain a proper implementation of the governmental policy involved in the Soldiers' and Sailors' Relief Act give the Government standing to bring this action? We think the answer to this question must be yes. The

special interest of the sovereign United States in the protection and enforcement of its policies and programs with respect to the members of the armed forces has been affirmed by the courts in numerous instances. [citing *Dameron v. Brodhead, supra.*]

\* \* \* \* \* \*

The right of the federal government to bring suit to enforce its policies and programs even in the absence of immediate pecuniary interest has been upheld in numerous other fields of federal activity. [citing, *inter alia, Debs, San Jacinto* and *American Bell Telephone, supra.*]

\* \* \* \* \* \*

\* \* \* Here we find that the interest of the national government in the proper implementation of its policies and programs involving the national defense is such as to vest in it the non-statutory right to maintain this action. Under these circumstances the incapacity of the individual plaintiff to maintain his action is immaterial since he may find shelter under the Government's umbrella.

326 F.2d at 931–33.

In *United States v. Solomon,* 563 F.2d 1121 (4th Cir. 1977), the Attorney General brought suit on behalf of the United States against three Maryland officials responsible for the operation of a state hospital for the mentally retarded, to obtain injunctive relief against the alleged deprivation of the patients' Eighth, Thirteenth, and Fourteenth Amendment rights. Chief Judge Northrop of this court concluded that the Attorney General did not have standing to bring the suit and, accordingly, dismissed the complaint. On appeal, Judge Winter, writing for the Fourth Circuit, affirmed. In so doing, Judge Winter summarized the historical development of the doctrine that the Attorney General may bring suit, in appropriate circumstances, even when not expressly or impliedly authorized by statute, and noted (at 1127) that "[i]f *Debs* is given its most expansive possible meaning," the United States may sue "whenever the alleged violations 'affect the public at large.' 158 U.S. at 586, 15 S.Ct. at 907

\* \* \*." However, Judge Winter refused to give *Debs* such an expansive reading:

Except for *Brand Jewelers* [318 F.Supp. 1293 (S.D.N.Y.1970)], no court has interpreted *Debs* as broadly as we are asked to do in the instant case. In this circuit we have held that the United States may sue to effect recovery of federal funds improperly disbursed. *Wilson Clinic & Hospital, Inc. v. Blue Cross of South Carolina,* 494 F.2d 50 (4 Cir. 1974). We have held that the United States may sue to enforce immunity of the armed forces to certain state taxes in accordance with a congressionally authorized program relating to national defense. *United States v. Arlington County,* 326 F.2d 929 (4 Cir. 1964). In *United States v. Marchetti,* 466 F.2d 1309 (4 Cir. 1972), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972), we held that the interest of the United States in national security where it had contractual rights to protect that interest permitted it to sue without explicit authority. In all of these cases, the United States had a property interest to be protected or there was a *well-defined statutory interest of the public at large to be protected.* \* \* \*

563 F.2d at 1127 (Emphasis added; footnote omitted). Judge Winter concluded that, since the Attorney General was not suing to protect "a well-defined statutory interest of the public," but rather was seeking merely to advance the broad constitutional rights of third persons, the federal government did not possess implied authority to bring the suit. However, Judge Winter, in so doing, specifically noted:

It is significant that several attempts extending over a period of twenty years to enact legislation empowering the Attorney General to bring the type of action represented by the instant case have failed of enactment.

\* \* \* \* \* \*

In the instant case, if we were to read *Debs* to authorize this suit, we would not only permit the executive to take action for which we have concluded he is neither

explicitly nor impliedly authorized to take, we would also authorize the executive to do what Congress has repeatedly declined to authorize him to do. See n.4, *supra*. Moreover, we would do so in an area where considerations of federalism and comity are also present. Although the instant case is a suit against certain officials of Rosewood, its effect on the State of Maryland is manifest. Congressional concern with federal-state relations in the area of civil rights is sufficiently great that we are reluctant to sustain nonstatutory executive acts in all but the clearest case.[29]

The *Solomon* decision rather clearly warns that the *Debs* decision not be applied over-broadly. However, *Solomon* itself also indicates that *Arlington County* is still good law in this Circuit. While *Solomon* may well bar a broad-scale executive law enforcement venture into certain areas of civil rights, particularly after Congress has expressly declined to authorize such suits, *Arlington County* makes it possible for the United States to exercise implied authority to bring suit to enforce an express and narrowly-drawn congressional statute granting tax immunity to members of the armed forces, in order to insure the "proper implementation of [the national government's] policies and programs involving the national defense." 326 F.2d at 932. As noted *supra*,[30] the tax exemption provisions of the 1977 legislation are patterned on the very provisions of the Soldiers' and Sailors' Civil Relief Act which were at issue in *Arlington County*. Indeed, as discussed *supra* in this opinion[31] Congress intended, in enacting the 1977 legislation, to extend to Members of Congress the same protections which Congress had provided for servicemen in the earlier Act.

As Judge Winter observed in *Solomon*, the Fourth Circuit has permitted the United States to bring suit, absent express statutory authority, in cases where the national government has "a property interest to be protected or there was a well-defined statutory interest of the public at large to be protected." 563 F.2d at 1127. As in the case of servicemen, Congress has expressly determined that the public interest is served by exempting from the burdens of Maryland income tax laws those Members of Congress who maintain Maryland abodes in order better to enable them to attend to their official duties in Washington. For reasons stated *supra*, this Court holds the 1977 legislation to be valid. It follows that under *Arlington County*, the United States has standing to bring this action to protect that "well-defined statutory interest of the public at large" and to ensure the "proper implementation of [the national government's] policies and programs."[32] The fact that the United States does not have a direct pecuniary interest in the outcome of the within litigation does not deprive it of implied authority to bring suit.

### The Tax Injunction Act

■ Defendants further contend that the within suit is barred by the provisions of the Tax Injunction Act, 28 U.S.C. § 1341, which provides:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.[33]

But the short answer to defendants' said position is that the provisions of the Tax Injunction Act do not erect a jurisdictional

29. *See also, United States v. City of Philadelphia*, 482 F.Supp. 1248 (E.D.Pa.1979).

30. *See* p. 355 *supra*.

31. *See* pp. 355 356 *supra*.

32. *Solomon, supra* at 1127. *See also, Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 474 n.13, 96 S.Ct. 1634, 1641 n.13, 48 L.Ed.2d 96

(1976); *United States v. Lewisburg Area Sch. Dist.*, 539 F.2d 301 (3rd Cir. 1976).

33. The specific language of the Tax Injunction Act speaks only in terms of injunctive relief. However, the policy of that statute similarly bars the grant of declaratory relief. *Great Lakes Dredge and Dock Company v. Huffman*, 319 U.S. 293, 299–301, 63 S.Ct. 1070, 1073–1074, 87 L.Ed. 1407 (1943).

bar to actions brought by the United States as plaintiff. In *Department of Employment v. United States*, 385 U.S. 355, 358, 87 S.Ct. 464, 466–467, 17 L.Ed.2d 414 (1966), Mr. Justice Fortas wrote:

> [W]e conclude, in accord with an unbroken line of authority, and convincing evidence of legislative purpose, that § 1341 does not act as a restriction upon suits by the United States to protect itself and its instrumentalities from unconstitutional state exactions.   *   *   *   [Footnotes omitted.] [34]

### Conclusion

The 1977 statute is valid. The imposition of the Maryland taxes herein involved is in direct contravention of the federal act and accordingly is invalid. The United States has standing and is not otherwise barred from obtaining injunctive and declaratory relief to enforce the validity of the 1977 federal act and to restrain the invalid imposition of the Maryland taxes.[35] Accordingly, the United States is entitled to such injunctive and declaratory relief. Therefore, judgment will be entered for plaintiff and an appropriate Order will be today entered.

---

34. *See also, United States v. Arlington County, Commonwealth of Virginia*, 326 F.2d 929, 931 (4th Cir. 1964), cited with approval by the Supreme Court in *Department of Employment v. United States*, 385 U.S. at 358 n.6, 87 S.Ct. at 466 n.6.

35. In view of the Court's conclusions with regard to the validity of the 1977 legislation and the existence of standing on the part of the United States, it is not necessary to reach the contentions of the United States that the Maryland taxes violate the rights of non-Maryland Members of Congress under procedural due process or equal protection principles because, *inter alia*, they are not voters in Maryland.