**OPERATION RESCUE NATIONAL, Philip F. Lawler, Randall Terry d/b/a Operation Rescue, and Robert D. Jewitt d/b/a Operation Rescue, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**C.A. No. 94–12504–MLW.**

United States District Court,
D. Massachusetts.

Aug. 27, 1997.

---

Paul F. Galvin, Office of Paul F. Galvin, Randall Fritz, Manchester, MA, for Plaintiffs.

Roberta T. Brown, U.S. Atty's Office,Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. SUMMARY

This action arises out of statements made by Senator Edward M. Kennedy on November 15, 1993, in Boston, Massachusetts. After participating in an event to raise funds for his upcoming campaign for reelection, Senator Kennedy was questioned by the media about, among other things, the "Freedom of Access to Clinics Act" (the "Face Act" or the "Bill"), which was to be considered by the United States Senate the next day. The Bill proposed to establish federal criminal penalties and civil remedies for interfering with access to facilities providing reproductive health care, including abortions. Senator Kennedy was leading the ultimately successful effort in the Senate to have the Bill enacted. In response to a question from the media, Senator Kennedy said, in part, that the proposed legislation was needed because "we have a national organization like Opera-

tion Rescue that has as a matter of national policy firebombing and even murder ..."

Operation Rescue, an unincorporated association of individuals dedicated to opposing abortion, and some of its members, brought this action against Senator Kennedy in the Norfolk Superior Court of the Commonwealth of Massachusetts. They allege that they were each defamed by Senator Kennedy's remarks and seek damages for injury to their respective reputations.

Pursuant to provisions of the Federal Tort Claims Act (the "FTCA"), which were added in 1988 by what is known as the "Westfall Act," the United States Attorney for Massachusetts certified that Senator Kennedy was acting within the scope of his employment when he made the. remarks now at issue. Accordingly, the United States Attorney removed this case to federal court, where the United States was substituted for Senator Kennedy as the defendant, as contemplated by the FTCA. Because the FTCA does not provide a remedy against the United States for libel or slander, the defendant has moved that this action now be dismissed.

Plaintiffs oppose the motion to dismiss. In addition, they have filed motions to remand to state court and to reinstate Senator Kennedy as the defendant. Plaintiffs argue that there were defects in the United States Attorney's certification process; that the substitution of the United States as the defendant was improper because the Westfall Act provisions of the FTCA do not apply to United States Senators and, in any event, because Senator Kennedy was not acting within the scope of his employment when he made his remarks regarding Operation Rescue; and that the application of the FTCA to immunize Senator Kennedy from liability for defamation would violate several provisions of the United States Constitution, particularly the Speech or Debate Clause, Art. I, § 6.

The court has held two hearings and carefully considered the parties' contentions, including the merits of plaintiffs' claim that if the Westfall Act protects members of Congress it is unconstitutional as applied—an issue that evidently has not been addressed previously by any court. For the reasons described in detail in this Memorandum, the court concludes as follows.

Operation Rescue has standing to maintain this case, although the individual plaintiffs may not. *See* § IV.A. Any alleged defects in the process utilized by the United States Attorney in deciding to certify that Senator Kennedy made his remarks concerning Operation Rescue while acting within the scope of his employment are not relevant. The remedy for any such error is the *de novo* review of the scope of employment issue by this court that plaintiffs have received. *See* § IV.D.

Senators are protected by the Westfall Act for alleged wrongs committed within the scope of their employment. *See* § IV.E. As described earlier, Senator Kennedy made the remarks about Operation Rescue alleged to be defamatory in response to a question from the media regarding proposed legislation he was leading the effort to enact. His remarks about Operation Rescue were made, at least in part, to inform the public of the reasons for his position on a legislative matter. Making such statements is one of a Senator's official duties. In acting on a motion to dismiss the court must view the record in the light most favorable to plaintiffs and give them the benefit of all reasonable inferences in their favor. Therefore, the court assumes for present purposes that the Senator's remarks were also motivated in some measure by a desire to promote his personal popularity, and thus enhance his ability to raise campaign funds and win votes. In our electoral system, however, such public and personal motives are essentially inseparable because it is natural for public officials to believe that their own success, and that of their political parties, are inextricably linked to the public interest. It is not necessary or appropriate for the court to attempt to determine the predominant motive for Senator Kennedy's remarks about Operation Rescue. Under Massachusetts law, which governs on this issue, Senator Kennedy's conduct may be deemed to be outside the scope of his employment only if he acted from purely personal motives that were in no way connected to his official duties. This is not such a case. *See* § IV.F.

Accordingly, the Westfall Act provides Senator Kennedy immunity for his remarks regarding Operation Rescue unless that statute is unconstitutional as applied to a United States Senator. Plaintiffs assert primarily that the Speech or Debate Clause of the Constitution, which provides immunity for a Senator's conduct while in Congress, prohibits a legislative expansion of that protection. That contention, however, is incorrect. The Westfall Act is not unconstitutional by virtue of the Speech of Debate Clause or for any other reason. *See* § IV.G.

The Constitution vests in Congress the power to legislate and the authority to enact laws it deems "necessary and proper" to facilitate the exercise of that power. Since Chief Justice John Marshall's seminal decision in *M'Culloch v. Maryland,* 17 U.S. (4 Wheat) 316, 4 L.Ed. 579 (1819), the Necessary and Proper Clause of the Constitution has been interpreted expansively. Courts traditionally uphold legislation that reasonably relates to one of the federal powers established by the Constitution, unless that legislation violates the Bill of Rights or some other specific restriction expressly included, or clearly implied, in the Constitution.

It was reasonable for Congress to conclude that more extensive immunity for Senators and Representatives than the protection provided by the Speech or Debate Clause is now needed to facilitate its power to legislate. Prior to the Westfall Act, members of Congress were required to defend suits for statements criticizing what they viewed as wasteful public spending, among others. As the Supreme Court recently reiterated in *Clinton v. Jones,* —— U.S. ——, ——, 117 S.Ct. 1636, 1643, 137 L.Ed.2d 945 (1997), in cases involving prosecutors, legislators, and judges, the Court has repeatedly held that providing immunity to such officials for actions relating to their governmental responsibilities serves the public interest by encouraging them to perform in a principled fashion, uninhibited by the fear that some candid statement or other action will generate expensive litigation and, perhaps, personal liability. The West-

fall Act also serves this purpose and is, therefore, reasonable.

Congress' power to expand the immunity provided by the Constitution for its members is not restricted by the Speech or Debate Clause. That provision does not expressly limit the power vested in Congress by the Necessary and Proper Clause to decide the most appropriate scope of legislative immunity today. Nor is such a prohibition implicitly manifest in the Speech or Debate Clause, which, for example, is not located in the prohibitions on legislative authority enumerated in Article I, § 9. Accordingly, because the Constitution does not place any special restriction on Congress' power to expand the immunity of its members, and because it was reasonable for Congress to exercise that authority by enacting the Westfall Act, plaintiffs have failed to prove that statute is unconstitutional as applied in this case.

Therefore, plaintiffs' motions to remand are being denied and defendant's motion to dismiss is being allowed. While this means that plaintiffs have no legal remedy for the wrong they allege that they have suffered, it does not mean that there is no means of holding Senator Kennedy and his colleagues in Congress accountable for defamatory remarks that they may make.

This case has required the court to reflect upon the current implications of first principles. In deciding it, the court is reminded that primary among these is the fundamental fact that our government derives its power from the people. This means, among other things, that Senators and Representatives must command the confidence of their constituents if they wish to retain their offices. Knowledge of this generally restrains the actions of members of Congress, even in an absence of the threat of a successful law suit for their actions. If plaintiffs wish to persist in their effort to redress the harm that they believe Senator Kennedy wrongly inflicted on them, they may appeal to the ultimate source of accountability in our democracy—they may appeal to the fairness of a free people and compete with Senator Kennedy for their verdict.[1]

---

1. Plaintiffs may also, of course, appeal this court's decisions to the Court of Appeals for the     First Circuit.

## II. PROCEDURAL BACKGROUND

Plaintiff's complaint was filed against Senator Kennedy in the Superior Court of the Commonwealth of Massachusetts for Norfolk County on November 15, 1994. After certification by United States Attorney Donald Stern that Senator Kennedy was acting within the scope of his federal employment at the time his statements about Operation Rescue were made, the United States removed the case to federal court pursuant to 28 U.S.C. §§ 2679(d)(2) and 1442(a)(1). On December 23, 1994, Judge Reginald Lindsay ordered the United States substituted as the sole defendant pursuant to 28 U.S.C. § 2679(d)(1). Following the recusals of Judges Lindsay and Richard Stearns, the case was assigned to this court.

On January 25, 1995, plaintiffs filed a motion to remand for procedural defects, alleging that the notice of removal and scope of employment certification of the United States Attorney are defective because they fail to provide sufficient facts to support a conclusion that Senator Kennedy was acting within the scope of his employment as a federal officer at the time he made the statements at issue.

On March 8, 1995, the United States filed a motion to dismiss plaintiffs' complaint on the grounds that the United States has not waived its sovereign immunity for claims for defamation, and that plaintiffs have failed to comply with the jurisdictional prerequisites for an FTCA suit as set forth in 28 U.S.C. §§ 2401 and 2675.

On July 14, 1995, plaintiffs filed a motion to vacate the scope of employment certification and a further motion to remand, both supported by memoranda addressing, principally, constitutional objections to the application of the Westfall Act to members of Congress.

Thus, at that time it appeared that the plaintiffs were alleging certain procedural defects in the certification process, but seeking to prevail primarily on the contention that the pertinent provisions of the FTCA were unconstitutional as applied to members of Congress, and reserving for possible later assertion foreseeable statutory claims that

even if the FTCA protected Senators from suit for defamation in some circumstances, Senator Kennedy was not entitled to such immunity in this case because he was not acting within the scope of his employment when he made the statements now at issue. In a June 29, 1996 Memorandum and Order the court noted that plaintiffs' initial motion to remand for alleged procedural defects did not appear to be meritorious and wrote:

Plaintiffs have suggested in their papers that they may also seek to challenge the Attorney General's scope of employment certification on non-constitutional grounds; i.e., on the grounds that Senator Kennedy was not acting within the scope of his employment when the statements in dispute were made. If plaintiffs do, in fact, wish to assert such a claim, it is appropriate to decide this scope of employment question prior to resolving any constitutional questions. "[I]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that [a federal court] ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Spector Motor Service v. McLaughlin,* 323 U.S. 101, 105, [65 S.Ct. 152, 154, 89 L.Ed. 101] (1944). At this point in the proceedings, the constitutional questions may be avoidable. If Senator Kennedy was not acting within the scope of his employment at the relevant time, then remand would apparently be proper and the constitutional challenges made by the plaintiffs would not need to be decided by the court. The Court of Appeals for the First Circuit has held that a district court has the duty to determine the scope of employment question when a plaintiff places the issue in dispute. *Nasuti v. Scannell,* 906 F.2d 802, 808 (1st Cir.1990).

Therefore, the court ordered that if the plaintiffs wished to seek a remand on statutory, rather than constitutional, grounds, they file and brief a motion on those grounds, which the court would consider before confronting the constitutional questions they had raised.

A hearing was held on November 19, 1996, at which the parties addressed the alleged

procedural defects in the certification process, the issue of the applicability of the Westfall Act provisions of the FTCA to United States Senators, and the question whether the remarks at issue were made by Senator Kennedy within the scope of his employment. At the conclusion of the hearing, it appeared to the court that the question of remand could not be resolved on statutory grounds alone and that it would be necessary to decide the constitutional issues presented. Thus, the parties were ordered to supplement their submissions concerning those issues. In addition, defendant was ordered to provide plaintiffs with any videotapes it had of the fundraising event and subsequent press conference at which the allegedly defamatory remarks were made. The parties subsequently filed supplemental memoranda addressing the constitutional issues, and plaintiffs filed a further "evidentiary memorandum" in support of their motion to vacate the scope of employment certification on nonconstitutional grounds.

A second hearing was held on March 17, 1997. That hearing focused primarily on the constitutional issues raised by plaintiffs. Subsequently, the parties filed further memoranda concerning the legislative history of the Westfall Act.

## III. FACTS

Except as otherwise noted, the following facts are undisputed. Edward M. Kennedy was in 1993, and remains, a United States Senator from Massachusetts. In November 1993, Senator Kennedy was the lead sponsor in the United States Senate of a pending bill, S. 636, entitled the "Freedom of Access to Clinic Entrances Act" (the "FACE Act" or "the Bill"). The Bill as ultimately enacted established federal criminal penalties and civil remedies for the use or threat of violence, physical obstruction, or destruction of property to interfere with access to facilities pro-

viding reproductive health care. *See* 18 U.S.C. § 248.

Senator Kennedy was also the Chairman of the Labor and Human Resources Committee, which had reported the Bill to the Senate, and was the manager for the legislation on the Senate floor, with responsibility for leading and organizing the debate in favor of the Bill. Senator Kennedy reported the Bill to the Senate on behalf of the Labor Committee on July 29, 1993. On Wednesday, November 10, 1993, the Senate agreed by unanimous consent to proceed to consideration of the Bill on the following Tuesday, November 16, 1993 at 8:00 a.m. From November 11 through November 15, 1993, the Senate was in recess for the Veteran's Day holiday and Senator Kennedy was away from Washington, D.C. During the holiday recess, Senator Kennedy and his staff continued to prepare for the Senate floor debate on the Bill.

On November 15, 1993, a campaign fundraising luncheon was held for Senator Kennedy at the Park Plaza Hotel in Boston. Senator Kennedy then planned to be a candidate for reelection in November 1994. The parties have stipulated that all expenses for the event were paid from Senator Kennedy's campaign fund. Senator Kennedy's wife, Victoria Reggie Kennedy, played a significant role in planning and orchestrating the event, which was billed as "Victoria Reggie Kennedy's Women's Luncheon Honoring Senator Edward M. Kennedy." Numerous elected officials were present, including, in addition to Senator Kennedy, five United States Senators. Also present were members of the media. Senator Kennedy did not separately address the media during the luncheon. Nor was there an opportunity during the luncheon for the media to pose questions to him.

Following the luncheon, Scott Ferson, a member of the Senator's staff, arranged for Senator Kennedy to be interviewed by the media.[2] The interview took place in a room

---

**2.** Ferson states in his affidavit that he arranged the interview in response to a number of requests by members of the media to speak with Senator Kennedy about the FACE Act and other topics. Ferson Decl. at ¶ 5. Plaintiffs contend that in the circumstances it is implausible to credit the claim that this media interview was not prear-

ranged, or at least anticipated by Senator Kennedy's staff. Pl's. Evidentiary Memorandum at 9–12. Although this fact is not material, for the purposes of this motion, the court accepts plaintiffs' claim that the media interview was anticipated if not prearranged.

adjacent to the ballroom in which the luncheon was held. Present in addition to Senator Kennedy were several reporters, television news camera crews, members of Senator Kennedy's campaign staff, Victoria Reggie Kennedy, and unidentified others.

Senator Kennedy responded to questions from the media concerning his campaign, business developments involving Delta Airlines and Logan Airport, the North American Free Trade Agreement, and the FACE Bill scheduled to be voted upon the next day. In response to a question from a member of the news media concerning the FACE Bill, Senator Kennedy made the following statement:

> Basically, this is legislation to deal with violence and constitutional rights. We're talking about access to a facility for a woman to be able to have her constitutional rights protected, but many of these facilities also provide extremely important services and preventative health care, prescreening, mammography, pap smears, and a number of other health-related items. So there's—people can have a difference on public policy issues, but *when we have a national organization like Operation Rescue that has as a matter of national policy firebombing and even murder, that's unacceptable.* This is a very targeted legislative remedy to deal with that kind of situation which exists in Massachusetts and in many other parts of the country. Massachusetts in the last two weeks has taken steps to address it and I think it's important that we did.

(emphasis added). This statement was repeated on November 16, 1993 by WBZ Television, Channel 4, in Boston, Massachusetts on its evening news program. Plaintiffs claim that the reference to Operation Rescue defames that organization and the individual plaintiffs who are prominent members of it.

The FACE Bill was considered by the Senate on November 16, 1993. It was enacted in May 1994. *See* 18 U.S.C. § 248.

## IV. DISCUSSION

### A. *Operation Rescue Has Standing To Maintain this Action*

The United States has not disputed plaintiffs' standing to bring this action. However, because the issue of standing relates to the court's subject matter jurisdiction, and because it is important that constitutional questions not be decided unnecessarily, the court has, *sua sponte*, considered the issue of plaintiffs' standing. The court concludes that Operation Rescue has standing and, therefore, the issues presented by this case must be decided notwithstanding the fact that the individual plaintiffs may lack standing.

To have standing under Article III, a plaintiff must show: (1) injury in fact; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *See United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* —— U.S. ——, ——, 116 S.Ct. 1529, 1533, 134 L.Ed.2d 758 (1996). Operation Rescue is an unincorporated association. *See* Complaint ¶ 1. It has pled facts sufficient to satisfy the first two prongs of the test for standing.

■ With regard to the third prong, as defamation is a cause of action created by the common law of Massachusetts, Massachusetts law defines whether Operation Rescue may sue for defamation. The Massachusetts Supreme Judicial Court has held that a corporation may sue for libel and has indicated that it would find that an unincorporated association has a cause of action for statements that wrongfully damage its reputation. *See Finnish Temperance Soc. Sovittaja v. Publishing Co.,* 238 Mass. 345, 352–56, 130 N.E. 845 (1921). In *Finnish Temperance* the Supreme Judicial Court reasoned that a "corporation ... may have a reputation which is equally as valuable to it as to a natural person, and may be injured in that reputation in the same way." *Id.* at 353, 130 N.E. 845. The Court went on to note that, "'[T]he question is really the same by whomsoever the action is brought.'" *Id.* at 353–54, 130 N.E. 845 (quoting *South Hetten Coat Company, Ltd. v. North–Eastern New Association, Ltd.,* (1894) 1 Q.B. 133, 138, 139, 140). The corporation, a temperance society, therefore was permitted to maintain an action for libel because "the good name of the plaintiff, if the ends for which it was incorpo-

rated are to be accomplished, is incidental to its very existence." *Id.* at 355, 130 N.E. 845.

This analysis is equally applicable to an unincorporated association like Operation Rescue. Thus, the court concludes that under the law of Massachusetts, as in other states, an unincorporated association may sue for defamation. *See Washburn v. Wright*, 261 Cal.App.2d 789, 793, 68 Cal.Rptr. 224 (1968) ("The rule generally accepted is that an unincorporated association has a cause of action for defamation in those circumstances in which a corporation has such a cause of action."); *Kirkman v. Westchester Newspapers*, 287 N.Y. 373, 380, 39 N.E.2d 919 (1942) ("The courts have no less a duty in [a case brought by an unincorporated association] than in a suit brought by a corporation or an individual, to protect good name [and] reputation ... from slanderous or libelous attacks.").

The individual plaintiffs, however, may lack standing to maintain this action. No individual was identified in Senator Kennedy's remarks. Where, as here, an individual claim is based on alleged group defamation "an individual member of the defamed class cannot recover for defamation unless 'the group or class is so small that the matter can reasonably be understood to refer to the member, or ... the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.'" *Eyal v. Helen Broadcasting Corp.*, 411 Mass. 426, 430 n. 6, 583 N.E.2d 228 (1991) (quoting *Restatement (Second) of Torts* § 564A). The facts alleged in the complaint concerning the individual plaintiffs are insufficient to permit the court to determine if, at this stage of the litigation, they should be deemed to have standing. *See* Complaint ¶¶ 2–4, 9. If this issue were material, the court would permit them to amplify the record. However, because Operation Rescue has standing, and because the considerations that compel dismissal of Operation Rescue's case are equally applicable to the individual plaintiffs, it is not necessary or appropriate to resolve the question of their standing.

B.  *Standard of Review*

■  The United States has filed a motion to dismiss this action pursuant to Fed.

R.Civ.P. 12(b)(1). As discussed more fully below, the Westfall Act provides that an action against the United States pursuant to the FTCA shall be the exclusive remedy for torts committed by government employees in the course of their employment. *See* 28 U.S.C. § 2679(b)(1). The FTCA represents a limited waiver of the United States' sovereign immunity from tort liability based upon the actions of its employees. *Block v. Neal*, 460 U.S. 289, 294, 103 S.Ct. 1089, 1092, 75 L.Ed.2d 67 (1983). However, the FTCA expressly preserves the United States' sovereign immunity from suits for defamation and other specified torts. *See* 28 U.S.C. § 2680(h). Accordingly, if the substitution of the United States as defendant in this action was proper, and the statute as applied is constitutional, the court lacks subject matter jurisdiction and plaintiffs' complaint must be dismissed. *See* 28 U.S.C. §§ 2674, 2679(b)(1); *Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir.1996); *see also* 14 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3654 (courts have no subject matter jurisdiction over causes of action barred by sovereign immunity).

The court reviews *de novo* the question whether the action in dispute was taken within the scope of the individual defendant's employment. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 421–25, 115 S.Ct. 2227, 2230–31, 132 L.Ed.2d 375 (1995); *Palmer v. Flaggman*, 93 F.3d 196, 198–99 (5th Cir.1996). "It is the plaintiff's burden to prove the existence of subject matter jurisdiction." *Aversa*, 99 F.3d at 1209 (citing *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir.), *cert. denied*, 515 U.S. 1144, 115 S.Ct. 2581, 132 L.Ed.2d 831 (1995)). Generally, in determining whether subject matter jurisdiction exists, the court must "construe the Complaint liberally and treat all well-pleaded facts as true, according the plaintiff the benefit of all reasonable inferences," although a plaintiff "may not rest merely on 'unsupported conclusions or interpretations of law.'" *Murphy*, 45 F.3d at 522 (quoting *Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 971 (1st Cir. 1993)).

In addition, the court may permit limited discovery, consider whatever evidence has been submitted, such as depositions and exhibits, and make such findings as are necessary to determine its subject matter jurisdiction. See *Rivera–Flores v. Puerto Rico Telephone Co.*, 64 F.3d 742, 748 (1st Cir. 1995); *Aversa*, 99 F.3d at 1210; *Nasuti v. Scannell*, 906 F.2d 802, 808 (1st Cir.1990).

The court has applied the foregoing standards in this case. Plaintiffs received the limited discovery they requested concerning the scope of employment issue, including the videotapes of the fundraising event and media interview. See Nov. 19, 1997 Tr. at 13; March 17, 1997 Tr. at 3. The parties agree that the facts necessary for the court's determination of the scope of employment issue are not in dispute, although plaintiffs contend that the media interview was part of a campaign event and ought to be viewed as such. Nov. 19, 1996 Tr. at 11–13. The court has considered the pertinent videotapes, which were played at the hearings. See Nov. 19, 1996 Tr. at 20; March 17, 1997 Tr. at 6. Thus, the court has all of the information necessary to determine the scope of employment issue.

Plaintiffs initially claimed, however, that they were entitled to additional discovery concerning the process and standards employed by the United States Attorney in certifying that Senator Kennedy was acting within the scope of his employment when he made the remarks at issue. As described in ¶ III.D, *infra*, at the November 19, 1996 hearing, the court expressed the view that such discovery was unnecessary because *de novo* review by the court renders immaterial any alleged defect in the certification of the United States Attorney, and plaintiffs' counsel agreed. See Nov. 19, 1996 Tr. at 40–41.

The questions whether the Westfall Act applies to members of Congress and, if so, whether it is unconstitutional as so applied are pure questions of law. Accordingly, all of the issues presented concerning the court's subject matter jurisdiction are ripe for resolution on defendant's motion to dismiss under Fed.R.Civ.P. 12(b)(1).

## C. *The Westfall Act*

█ In 1988, the Federal Employees Liability Reform and Tort Compensation Act, commonly known as the Westfall Act, was enacted. The statute was a response to the Supreme Court's 1988 decision in *Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619, which held that the judicially crafted doctrine of absolute, official immunity applied only to discretionary acts of government officials. See, *id.* at 297, 108 S.Ct. at 584. The Westfall Act amended the FTCA to make an action against the United States the exclusive remedy for money damages for any injury arising from the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). Thus, tort actions may no longer be maintained against federal employees in their individual capacities where the alleged tort was committed within the scope of employment. This is true even where, as in the case of an action for defamation, the doctrine of sovereign immunity precludes governmental liability.[3] *United States v. Smith*, 499 U.S. 160, 165–67, 111 S.Ct. 1180, 1184–86, 113 L.Ed.2d 134 (1991).

With regard to those protected, the Westfall Act provides that the term:

> "Employee of the government" includes officers and employees of any federal agency, [military personnel], and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

28 U.S.C. § 2671. The Act defines "federal agency" to include "the executive department, the judicial and legislative branches ..." *Id.*

Pursuant to the Act, in any civil action filed against a federal employee, the Attorney General is empowered to certify that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1). The Attorney General

---

**3.** The FTCA provides, in pertinent part, that a FTCA remedy shall not be available for "any claim arising out of ... libel [or] slander ..." 28 U.S.C. § 2680(h).

has delegated this authority to the United States Attorneys. *See* 28 C.F.R. § 15.3(a).

> Upon such certification:
>
> any civil action or proceeding commenced upon such claim in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or proceeding is pending. Such action or proceeding shall be deemed to be an action or proceeding brought against the United States ... and the United States shall be substituted as the party defendant. This certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal.
>
> Upon certification, any action or proceeding ... shall proceed in the same manner as any action against the United States filed pursuant to [the FTCA], and shall be subject to the limitations and exceptions applicable to those actions.

28 U.S.C. 2679(d)(2), (4).

### D. *This Case Should Not Be Remanded Because of Alleged Defects in the Certification Procedure*

█ Plaintiffs contend that the Attorney General's scope of employment certification should be vacated because it "constitutes a mere conclusion and is neither candid, specific nor positive in allegations of fact," and because it fails "to show any possible causal connection between the original defendant's conduct and the scope of his employment." Pl's. Jan. 25, 1995 Motion to Remand at 2. However, as set forth below, neither a failure to provide an adequate statement of reasons in support of the certification nor a lack of independence on the part of the certifying official provides grounds for the court to vacate the certification and remand this action to state court. Rather, the remedy for

any defect in the United States Attorney's certification is *de novo* review by the court of the scope of employment issue.

In essence, the Westfall Act does not rely at all upon the integrity or correctness of the United States Attorney's decision to substitute the United States for an individual defendant based upon a finding that he or she was acting within the scope of employment in connection with the conduct at issue. As the Supreme Court has observed, "a U.S. Attorney, in cases of this order, is hardly positioned to act impartially." *Gutierrez*, 515 U.S. at 429, 115 S.Ct. at 2233. Evidently in recognition of this, under the Westfall Act there is an "absence of an obligation on the part of the Attorney General's delegate to conduct a fair proceeding, indeed any proceeding. She need not give the plaintiff an opportunity to speak to the 'scope' question, or even notice that she is considering the question. Nor need she give any explanation for her action." *Id.* at 429, 115 S.Ct. at 2234.

This does not, however, mean that a United States Attorney has unfettered discretion in deciding whether the United States should be substituted for an individual defendant. To the contrary, if challenged, he or she ultimately has no discretion with regard to this issue because the district court is obliged to review the scope of employment issue *de novo*, giving no deference to the United States Attorney's determination.[4] *Id.* at 433–37, 115 S.Ct. at 2236–37; *see also Aversa*, 99 F.3d at 1208–10; *Palmer*, 93 F.3d at 198–99. Accordingly, "the Attorney General's scarcely disinterested certification on the matter [of the proper defendant] is by statute made the first, but not final word." *Gutierrez*, 515 U.S. at 432, 115 S.Ct. at 2235.[5]

Therefore, plaintiffs do not have a right to a remand, or reinstitution of Senator Kennedy as the defendant, based upon any alleged procedural deficiency in the United States Attorney's decision that the United States is

---

**4.** As described in § III.E, *infra*, the plaintiff has the burden of proving that the United States Attorney's decision was incorrect. *See Rogers v. Management Technology, Inc.,* 123 F.3d 34, 36–37 (1st Cir.1997).

**5.** The United States Attorney's certification is, however, dispositive of whether the case will

proceed in state or federal court. Even if the district court determines the United States Attorney erred, the case remains in federal court. *See* 29 U.S.C. § 2679(d)(2); *Gutierrez*, 515 U.S. at 431–35, 115 S.Ct. at 2235–36; *Rogers*, 123 F.3d at 36–37.

the proper defendant in this case. Rather, the remedy for purported imperfections in the certification process is the *de novo* review by the court which they have received.

E. *Senators are Covered By The Westfall Act*

██ Plaintiffs contend that Senators are not covered by the Westfall Act because they are members of Congress rather than officers or employees of the legislative branch. As set forth below, plaintiffs rightly recognize that the Constitution and some statutes have made a distinction between members of Congress and its officers and employees. There are other statutes, however, which treat Senators and Representatives as officers and employees of the government; Senators are elected by the people, but employed in the legislative branch and, therefore, fit within the literal definition of "employee of the government;" and legislative history indicates that Congress understood the Westfall Act to cover its members. In the sole case addressing this issue, the Fifth Circuit concluded that members of Congress are "employees of government" and are entitled to the immunity provided by the Westfall Act. *See Williams v. United States*, 71 F.3d 502, 504 (5th Cir.1995). This court agrees that conclusion is correct.

As described earlier, the Westfall Act provides immunity for "any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1); *see also Aversa*, 99 F.3d at 1208 ("The Westfall Act provides that a federal employee is immune if he or she acted 'within the scope of his office or employment.'"). "'Employee of the government' includes officers and employees of any federal agency ..." 28 U .S.C. § 2671. "Federal agency" includes "the executive department, the judicial, and legislative branches ..." *Id.*

As plaintiffs point out, the framers of the Constitution followed a consistent practice of using the term "officer" to refer to appointed agents of government, in contrast to their use of the terms "Member," "Representative" or "Senator" to refer to legislators. *See* U.S. Const. art. I, §§ 3, 5 and 6 and Art. II, §§ 2, 3 and 4. In contrast to the FTCA, the Constitution does not utilize the term "employee" at all.

Plaintiffs are also correct that there are several instances in which later lawmakers have followed the taxonomy set out in the Constitution. 2 U.S.C. § 60–1(b), for example, defines "Officer of the Congress" as "an elected officer of the Senate or House of Representatives who is *not* a Member of the Senate or House ..." (emphasis added). In addition, Title V of the United States Code distinguishes among "Employees," "Officers," and "Members of Congress" for certain purposes, *see* 5 U.S.C. § 2104–06, as does the Internal Revenue Code. *See* 26 U.S.C. § 7701(j) and (k). *See also* S.Res. 492, 97th Cong. (1982), discussed *infra*, n. 8, (authorizing Sergeant at Arms of Senate to process claims brought "for the negligent or wrongful act or omission of any Member, Officer, or employee of the Senate ...").

Contrary to plaintiff's claim, however, the term "officer" has been employed in other statutes to describe Senators and Representatives, among others. In *Lamar v. United States*, 241 U.S. 103, 111–12, 36 S.Ct. 535, 537–38, 60 L.Ed. 912 (1916), the Supreme Court determined that a member of the House of Representatives was an "officer of the government" within the meaning of a penal statute making it a crime to "falsely assume or pretend to be an officer or employee acting under the authority of the United States, or any Department, or any officer of the government thereof...." In holding that the statute included members of Congress the Supreme Court noted that, as in the instant matter, "the issue here is not a constitutional one, but who is an officer ... within the provisions of" a particular statute. *Id.* at 112, 36 S.Ct. at 538.

In *Lamar*, the Supreme Court stated that it was "clearly of the opinion that such members are embraced by the comprehensive terms of the statute," *id.* at 112, 36 S.Ct. at 538:

> (a) Because prior to and at the time of the original enactment in question the common understanding that a member of the House of Representatives was a legislative officer ... was clearly expressed in the ordinary, as well as legal, dictionaries;

(b) Because at or before the same period in the Senate of the United States, after considering the ruling in the Blount Case [6], it was concluded that a member of Congress was a civil officer of the United States within the purview of the law requiring the taking of an oath of office; [and]

(c) Because also in various general statutes of the United States at the time of the enactment in question a member of Congress was assumed to be a civil officer of the United States.

*Id.* at 113, 36 S.Ct. at 538 (citations omitted). The Supreme Court also noted that treating Senators and Representatives as "officers" of Congress "harmonizes with the settled conception of the position of members of state legislative bodies as expressed in many state decisions." *Id.*

Senators and Representatives have also been deemed to be "officers" of Congress for the purpose of 28 U.S.C. 1442(a)(1), which authorizes removal of a civil or criminal action brought in state court against "[a]ny officer of the United States or any agency thereof ... for any act under color of such office ..." *See Richards v. Harper,* 864 F.2d 85, 86–7 (9th Cir.1988); *Maddox v. Williams,* 855 F.Supp. 406, 409 (D.D.C.), *aff'd* 62 F.3d 408 (D.C.Cir.1995); *Hill Parents Ass'n. v. Giaimo,* 287 F.Supp. 98, 99–100 (D.Conn. 1968); *Preston v. Edmondson,* 263 F.Supp. 370, 372 (N.D.Okla.1967). In *Hill Parents Ass'n,* the court also noted that in addition to subsection (a)(1), members of Congress are also treated as "officers" of Congress in 28 U.S.C. § 1442(a)(4), which authorizes removal of actions brought in state courts against "[a]ny officer of either House of Congress, for any act in the discharge of his official

duty under an order of such House." 287 F.Supp. at 99.

Moreover, it remains true that, as the Supreme Court observed in *Lamar,* 241 U.S. at 113, 36 S.Ct. at 538, interpreting a Senator to be an officer of Congress for the purpose of the Westfall Act would be consistent with the customary understanding of that term as reflected by its definition in standard dictionaries. For example, *Webster's Third New International Dictionary* (1981), at 1567, defines "officer," in part, as: "one who holds an office[ ]; one who is appointed or elected to serve in a position of trust, authority, or command." *The Random House Dictionary of the English Language,* (2d ed.1987), at 1344–45, defines "officer," in part as "a person appointed or elected to some position of responsibility or authority in the government...." [7] Similarly, a leading legal dictionary, *Black's Law Dictionary* (6th ed.1990), at 900, defines a "legislative officer" as "[o]ne of those whose duties relate mainly to the enactment of laws, *such as members of congress* and of the several state legislatures." (emphasis added).

Although not perfectly clear on the issue, the relevant legislative history also supports the conclusion that the Westfall Act intended to provide immunity to Senators and Representatives. This issue is not addressed directly in the 1988 House Committee on the Judiciary Report concerning the legislation, H.R.Rep. No. 700, 100th Cong., 2nd Sess. 1988, 1988 WL 169931, *reprinted in* 1988 U.S.C.C.A.N. 5945, and the Senate did not issue a report. However, there is evidence that two years later, in 1990, the House of Representatives Committee on the Judiciary viewed the Westfall Act as covering members of Congress, as well as the "rank and file" employees that it was primarily intended to protect.[8] More specifically, a 1990 House

---

**6.** As described in *Lamar,* in the *Blount* case, Whart.St.Tr. p. 200, it was held that "a Senator of the United States was not a civil officer subject to impeachment within the meaning of § 4 of article 2 of the Constitution." 241 U.S. at 112, 36 S.Ct. at 538.

**7.** *The Oxford English Dictionary* (2d ed.1989), at 132, defines officer, in part, as "a person authoritatively appointed or elected to exercise some function pertaining to public life."

**8.** In its 1988 report concerning the Westfall Act, the House Committee on the Judiciary expressed concern that the Supreme Court's decision in *Westfall,* 484 U.S. at 292, 108 S.Ct. at 581, which held that absolute, official immunity applied only to "discretionary" acts of government officials, *id.,* at 299, 108 S.Ct. at 585, would "have its most severe impact on lower-level employees; that is, the 'rank and file' workers who are least likely to exercise discretion in carrying out their duties." 1988 WL 169931, at *2.

Report concerning a proposed amendment to the Westfall Act dealing with certification and defense of tort claims against House personnel states:

> Since enactment of the Westfall bill, there has been concern as to whether it is consistent with the principles of separation of powers under the Constitution for the Attorney General to determine when Members of Congress and their employees are acting within the scope of employment. There also has been concern about whether it is appropriate for the Attorney General to defend Members and their employees in all such cases.

H.R.Rep. No. 1015, 101st Cong., 2d. Sess. 1990, 1991 WL 4376, at *293–94. To avoid these potential separation of powers problems, the bill, if enacted, would have amended the certification provisions of the FTCA to provide that:

> in the event a tort claim is filed against a Member or employee of the United States House of Representatives, the Speaker of the House would determine if that individual was acting within the scope of employment in performing the acts subject to such tort claim.

*Id.* at *295. Thus, it is clear that in 1990, the House Committee on the Judiciary, which authored the report, understood the FTCA to apply to Members of Congress as well as lower-level employees.[9]

"Although subsequent legislative history is less authoritative than contemporaneous explanation," it is nonetheless "entitled to great weight in statutory construction." *Roosevelt*

*Campobello International Park Commission v. EPA,* 711 F.2d 431, 436–37 (1st Cir.1983) (citation omitted). Where the contemporaneous legislative history is ambiguous or fails to speak directly to an issue, it is particularly appropriate for the court to consider subsequent statements. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980) ("[W]hile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, . . . such views are entitled to significant weight, . . . and particularly so when the precise intent of the enacting Congress is obscure.") (citations omitted). This court recognizes that Congress did not enact the amendment being addressed in 1990, and thus the weight of the House Report may be diminished. That report, however, is consistent with the claim that the Westfall Act applies to Senators and Representatives.

Significantly, the Court of Appeals for the Fifth Circuit—the sole Court of Appeals to address this issue—found that the Westfall Act protected a Congressman charged with making defamatory statements because:

> A Member of Congress who holds an office in the U.S. House of Representatives is clearly an employee or officer of the legislative branch of the federal government. The plain language of the statute thus suggests that Members of Congress are employees of the government, for "[s]ection 2679(b)(1) applies without exception to 'any employee of the Government,' and section 2671, as amended by the Westfall Act, provides that officers and employees

---

9. Indeed, a 1982 Senate Resolution authorizing the Sergeant at Arms of the Senate to process claims for money damages against the United States arising out of "the negligent or wrongful act or omission of any Member, Officer, or employee of the Senate while acting within the scope of his office or employment," S.Res. 492, 97th Cong. (1982), indicates that the Senate believed prior to the Westfall Act that the FTCA protected its members.

The House, however, evidently had a different understanding of the coverage of the FTCA prior to the enactment of the Westfall Act. In its 1988 Report, the House Committee on the Judiciary stated that the Westfall Act was intended to, among other things, "explicitly extend[ ] the coverage of the FTCA to officers and employees of the legislative and judicial branches," and that

"[t]he FTCA currently covers employees of the Executive Branch only." 1988 WL 169931, at *4. *But see McNamara v. United States,* 199 F.Supp. 879 (D.D.C.1961) (holding that FTCA applied to all three branches of government); *United States v. LePatourel,* 571 F.2d 405 (1978), *modified on reh'g en banc,* 593 F.2d 827 (8th Cir.1979) (holding that judiciary and federal judges were covered by the FTCA). *See contra Foster v. Bork,* 425 F.Supp. 1318, 1319–20 (D.D.C.1977) (judiciary not covered by FTCA); *Foster v. MacBride,* 521 F.2d 1304, 1305 (9th Cir.1975) (same); *Cromelin v. United States,* 177 F.2d 275, 277 (5th Cir.1949), *cert. denied,* 339 U.S. 944, 70 S.Ct. 790, 94 L.Ed. 1359 (1950) (neither federal district judge nor court-appointed trustee covered by FTCA).

of the [legislative branch] are encompassed within that phrase." If Congress intended to exclude Members of Congress from the protection of the FTCA, it could have expressly done so within the language of the Act. Therefore, we find that as an employee of the government as defined under the FTCA, [the Congressman] is eligible for coverage if his conduct at issue was within the scope of his employment.

*Williams,* 71 F.3d at 504–5 (quoting *Sullivan v. United States,* 21 F.3d 198, 202 (7th Cir.), *cert. denied,* 513 U.S. 1060, 115 S.Ct. 670, 130 L.Ed.2d 604 (1994)).

As indicated in *Williams,* the Court of Appeals for the Seventh Circuit in *Sullivan* held that "[s]ection 2679(b)(1) [which makes the FTCA the sole remedy in certain cases] applies without exception to 'any employee of the government.'" 21 F.3d at 202. The court went on to hold that because "[l]iterally, federal public defenders are federal employees," the "plain language of the statute" suggested that they were also within the coverage of the Act. *Id.* This analysis is, as the Fifth Circuit found in *Williams,* also applicable to members of Congress.

In view of the foregoing, this court too concludes that by virtue of the Westfall Act the FTCA provides immunity for Senator Kennedy for any allegedly defamatory statement that he made within the scope of his employment.

### E. *Senator Kennedy's Remarks Were Made Within the Scope of His Employment*

Plaintiffs claim that even if members of Congress are covered by the Westfall Act in some circumstances, Senator Kennedy is not protected in this case because his remarks regarding Operation Rescue were not made within the scope of his employment. This claim, however, is also incorrect.

■ The question whether a federal employee's actions fall within the "scope of . . . office or employment" is to be determined with reference to the *respondeat superior* law of the state in which the alleged tort occurred—in this case Massachusetts. *Aversa,* 99 F.3d at 1208; *Kelly v. United States,* 924 F.2d 355, 357 (1st Cir .1991); H.R.Rep.

No. 700, 100th Cong., 2d Sess.1988, 1988 WL 169931, at *5, *reprinted in* 1988 U.S.C.C.A.N. 5945, 5949. "[I]n situations such as this one, where a plaintiff asserts that a defendant acted outside the scope of his or her employment despite the Attorney General's certification to the contrary, the burden of proof is on the plaintiff." *Rogers v. Management Technology, Inc.,* 123 F.3d 34, 37 (1st Cir. 1997); *see also Aversa,* 99 F.3d at 1209.

■ In Massachusetts, the "conduct of an agent is within the scope of employment (1) if it is of the kind he is employed to perform; (2) if it occurs substantially within the authorized time and space limits; and (3) if it is motivated, at least in part, by a purpose to serve the employer." *Kelly v. United States,* 924 F.2d 355, 357 (1st Cir.1991) (quoting *Wang Laboratories, Inc. v. Business Incentives, Inc.,* 398 Mass. 854, 859, 501 N.E.2d 1163 (1986)).

■ Contrary to plaintiffs' contention, Massachusetts law does not provide that an "intentional tort" such as defamation may never be within the scope of an individual's employment. The Court of Appeals for the First Circuit has recognized that "an intentional tort . . . can be within the scope of employment if state *respondeat superior* law so requires." *Aversa,* 99 F.3d at 1209. Under Massachusetts law, defamatory statements may be found to have been made within the scope of an individual's employment. *See Howard v. Town of Burlington,* 399 Mass. 585, 591, 506 N.E.2d 102 (1987) (holding town official's allegedly defamatory statements were made within the scope of her employment for purposes of state indemnification statute); *Kelly,* 924 F.2d at 357 (holding that, under Massachusetts law, a federal Drug Enforcement Administration agent's allegedly defamatory statements were made within the scope of his employment). Whether the alleged defamation was committed within the scope of an individual's employment is determined by operation of the *Wang* test. *Howard,* 399 Mass. at 589, 506 N.E.2d 102; *Kelly,* 924 F.2d at 357.

The first prong of the *Wang* test requires a determination of the duties a person is employed to perform. 398 Mass. at 859, 501

N.E.2d 1163. Plaintiffs insist that for a Senator these duties extend no further than to "the essential elements of the legislative process, namely, speech, debate, and deliberation" undertaken within the legislative chambers. Pl.'s Aug. 14, 1996 Mem. at 3. This assertion is incorrect.

■ Under Massachusetts law, "it is ordinarily the actual and customary, rather than formally described, duties which determine scope of employment." *Howard*, 399 Mass. at 590, 506 N.E.2d 102. In addition, "[t]he scope of an employee's employment is not construed restrictively." *Id.* (citing *Commonwealth v. Jerez*, 390 Mass. 456, 461–62, 457 N.E.2d 1105 (1983)).

Because Senator Kennedy is a federal official, federal law defines the "nature and contours of his . . . federal responsibilities." *Aversa*, 99 F.3d at 1209; *see also Platis v.. United States*, 409 F.2d 1009, 1011 (10th Cir.1969). The duties of members of Congress enumerated in the Constitution are very few.[10] Such duties do not, for example, include the duties to debate and vote on proposed legislation.

It has been widely recognized by the federal courts, however, that a member of Congress' official duties extend well beyond those enumerated in the Constitution and the additional responsibilities protected by the Speech or Debate Clause, Art. I, § 6. For example, in *United States v. Brewster*, 408 U.S. 501, 512, 92 S.Ct. 2531, 2537, 33 L.Ed.2d 507 (1972), the Supreme Court stated:

> It is well known, of course, that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate "errands" performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called "news letters" to constituents, news releases and speeches delivered outside the Congress.

The range of these related activities has grown over the years.

The Supreme Court noted that these "official duties" are "expected by constituents" and are "entirely legitimate." *Id. See also Chastain v. Sundquist*, 833 F.2d 311, 314 (D.C.Cir.1987) (holding that Speech or Debate Clause does not provide immunity for acts, such as letter-writing, which are "taken in a member's 'official capacity' " but which are not integral parts of the actual process of legislation).

Most significantly, in *Williams*, a case closely analogous to the instant action, holding that allegedly defamatory statements made in the course of an interview by the media were within the scope of a Congressman's duties under Texas principles of agency, the Court of Appeals for the Fifth Circuit identified a similarly broad range of official duties pertaining to members of Congress:

> Members of Congress traditionally communicate to the public about issues of law, often expressing their concerns and opinions about the need to change the laws. Indeed, the legislative duties of Members of Congress are not confined to those directly mentioned by statute or the Constitution. Besides participating in debates and voting on the Congressional floor, a primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents. Such service necessarily includes informing constituents and the public at large of issues being considered by Congress.

*Williams*, 71 F.3d at 507.

■ In making the remarks now claimed to be defamatory, Senator Kennedy was informing his constituents and the general public of his view on pending legislation scheduled to be considered by the Senate the next day. Such statements were "of the kind he [was] employed to perform." *Wang*, 398 Mass. at 859, 501 N.E.2d 1163. Thus, the first prong of the *Wang* test is satisfied.

---

10. U.S. Const. art. I, § 5, cl. 1 provides:
   Each House shall be the Judge of its own Elections, Returns, and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

In the present case, the analysis concerning the second and third prongs of the *Wang* test—whether the conduct in question occurred substantially within authorized time and space limits and whether it was motivated, at least in part, by a purpose to serve the employer, 398 Mass. at 859, 501 N.E.2d 1163—is substantially similar. In essence, plaintiffs contend that the remarks at issue were made in connection with a fundraising event and were motivated by a desire to generate campaign funds and votes for Senator Kennedy. Thus, plaintiffs claim that the comments in question fail to satisfy the final elements of the *Wang* test and should be deemed to have been made outside of the scope of Senator Kennedy's duties as a member of Congress.

As indicated earlier, at this stage of this litigation the court is required to "indulg[e] all reasonable inferences in favor of the plaintiff." *Aversa*, 99 F.3d at 1210. The court may, however, consider whatever evidence has been furnished in this case, and hold evidentiary hearings to resolve immunity-related factual disputes. *Id.; Nasuti*, 906 F.2d at 808. The court has held such hearings and has considered the only evidence that plaintiffs proffered—the videotapes. From that process, certain undisputed facts emerge, including the following.

The remarks at issue were made in Massachusetts, the home of Senator Kennedy's constituents. They were not made gratuitously in Senator Kennedy's speech at the fundraising event. Rather, they were made in response to questions posed by the media, in a room adjoining the ballroom in which the fundraiser was held, immediately following that event. The primary audience for Senator Kennedy's remarks regarding Operation Rescue was members of the media, although the court assumes that some of the unidentified individuals in the videotape attended the fundraiser and also heard them. Senator Kennedy's comments related to the Bill which he was leading the effort to have the Senate vote favorably upon the next day, November 16, 1993. Senator Kennedy was not up for reelection until November 1994.

For the reasons described earlier, plaintiffs' claim that the sole authorized place for

the performance of Senator Kennedy's duties was the United States Senate in Washington, D.C. is incorrect. It is customary and proper for Senators to address the merits of pending legislation, in the response to members of the media, while in their home states. The fact that in this case the remarks in question were made immediately following a fundraising event does not qualify the conclusion that the second prong of the *Wang* test is satisfied.

Looking at the evidence in the light most favorable to plaintiff, the court infers for present purposes that one motive for Senator Kennedy's remarks about Operation Rescue was to enhance his popularity in Massachusetts. The court also infers that such enhanced popularity would facilitate fundraising for Senator Kennedy's reelection campaign and ultimately help generate the votes he needed to remain in office. At the same time, however, he was making statements that would inform his constituents and others of his position concerning the merits of the FACE Bill and the reasons its enactment was, in his view, required. Thus, Senator Kennedy was providing political leadership and a basis for voters to judge his performance in office—two activities that public officials are expected, and should be encouraged, to perform. See, *e.g., Williams*, 71 F.3d at 507. Such personal and public motives are often closely related. It is natural for public officials to believe that their own success, and that of their political parties, is inextricably linked with the public interest.

Under Massachusetts law, "the fact that the predominant motive of the [employee] is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority." *Wang*, 398 Mass. at 859–60, 501 N.E.2d 1163; *see also Rogers*, 123 F.3d at 38. Only "[i]f an employee 'acts from purely personal motives . . . in no way connected with the employer's interests, [is] he considered in the ordinary case to have departed from his employment, and the master is not liable.' " *Pinshaw v. Metropolitan District Commission*, 402 Mass. 687, 694–95, 524 N.E.2d 1351 (1988) (quoting

W. Prosser & W. Keeton, *Torts* 506 (5th ed.1984)). It is clear that this is not such a case and that no reasonable factfinder could conclude otherwise.

Accordingly, the Westfall Act provides Senator Kennedy immunity for his remarks regarding Operation Rescue unless that statute is unconstitutional as applied to a United States Senator. It is, therefore, necessary for the court to decide whether the Westfall Act is unconstitutional as applied in this case.

F. *The Westfall Act is Constitutional as Applied to Members of Congress Acting Within the Scope of Their Employment*

█ The parties agree that Senator Kennedy's comments concerning Operation Rescue are not protected by the Speech or Debate Clause of the Constitution, Art. 1, § 6, cl. 1, or the judicially crafted doctrine of absolute, official immunity. Their understanding is correct. *Hutchinson v. Proxmire*, 443 U.S. 111, 113, 99 S.Ct. 2675, 2677, 61 L.Ed.2d 411 (1979); *National Association of Social Workers v. Harwood*, 69 F.3d 622, 630 (1st Cir.1995); *Williams v. Brooks*, 945 F.2d 1322, 1331 (5th Cir.1991); *Chastain v. Sundquist*, 833 F.2d 311, 314, 317 (D.C.Cir. 1987). The Speech or Debate Clause provides that, "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." Art. 1, § 6, cl. 1. This provision "protects all lawmaking activities undertaken in the House and Senate, but affords no constitutional immunity beyond its carefully defined scope." *Chastain*, 833 F.2d at 314; *see also National Association of Social Workers*, 69 F.3d at 630. The absolute, official immunity of members of Congress is coextensive with the scope of immunity provided by the Speech or Debate Clause. *Chastain*, 833 F.2d at 316; *Williams*, 945 F.2d at 1327. Accordingly, absent the Westfall Act, Senator Kennedy would be subject to this suit by Operation Rescue for defamation because it is based on statements made outside of Congress. *National Association of Social Workers*, 69 F.3d at 630; *Williams*, 945 F.2d at 1331; *Chastain*, 833 F.2d at 314–16; *Hutchinson*, 443 U.S. at 127, 99 S.Ct. at 2684.

As described earlier, however, the Westfall Act expands immunity for members of Congress to provide protection for all acts taken by them within the scope of their employment. Plaintiffs assert that as applied to members of Congress, the Westfall Act is unconstitutional. As described, *infra*, there are not in this case circumstances requiring heightened scrutiny. Thus, the Westfall Act, as "an act of Congress [is] clothed with a presumption of constitutionality, and the burden is on the plaintiff to show that it [is unconstitutional]." *Hammond v. United States*, 786 F.2d 8, 12 (1st Cir.1986) (upholding validity of federal statute substituting United States as defendant in suits against private contractors for radiation injuries, and making the Federal Tort Claims Act the sole remedy for those injuries). More specifically, the plaintiff must prove that the statute is unconstitutional as applied in this particular case. *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 2914–15, 37 L.Ed.2d 830 (1973); *United States v. Ferrara*, 771 F.Supp. 1266, 1282–83 (D.Mass.1991).

█ In essence, Operation Rescue contends that to the extent that the Westfall Act provides immunity to members of Congress for conduct that is not protected by the Speech or Debate Clause it is unconstitutional because the Constitution does not expressly authorize such legislation and the Speech or Debate Clause prohibits it. This contention is incorrect.

It is true that the Constitution creates a federal government of limited powers. As James Madison wrote, "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." *The Federalist* No. 45, at 137 (Roy P. Fairfield, ed., 2d ed.1981). *See also* U.S. Const. Amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the states respectively, or to the people.") As explained in detail by the Court of Appeals for the District of Columbia in *Chastain*, among the powers that remained with the states after enactment of the Constitution was the power to provide a remedy for

defamatory statements made by a Senator in his home state even though he would have had immunity if the same statements had been made in the Senate. 833 F.2d at 316–26; *see also Doe v. McMillan*, 412 U.S. 306, 311–25, 93 S.Ct. 2018, 2024–31, 36 L.Ed.2d 912 (1973).

This does not necessarily mean, however, that Congress lacks the power to expand by statute the immunity for its members provided by the Constitution. Article I, § 1 of the Constitution provides that: "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." Article I, § 8 enumerates seventeen specific powers granted to Congress and also provides that Congress has the power:

> (18) To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, *and* all other powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

(emphasis added). Therefore, as clearly manifested by its express terms:

> The necessary and proper clause attaches not only to the enumerated congressional powers of Article I, § 8, but also to "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Thus it broadens the legitimate ends of congressional action well beyond those ancillary to the explicit legislative grants of Article I.

Laurence H. Tribe, *American Constitutional Law*, § 5–3, at 304 (2d ed.1988). Accordingly, this court concludes, contrary to Operation Rescue's contention, that the authority provided by the Necessary and Proper Clause applies to the general power to legislate vested in Congress by Article I, § 1, as well as to the seventeen subjects of legislation particularly described prior to that clause in Article I, § 8. *See United States v. Maryland*, 488 F.Supp. 347, 356 (D.Md.), *aff'd*, 636 F.2d 73 (4th Cir.1980), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3005, 69 L.Ed.2d 388 (1981) (finding federal statute exempting members of Congress from state taxes to be constitutional).

The classic statement of the meaning of the Necessary and Proper Clause was provided in 1819 by Chief Justice John Marshall in *M'Culloch v. Maryland*, 17 U.S. at 404. In *M'Culloch*, the Supreme Court addressed whether the powers delegated to Congress by the Constitution included the authority to incorporate a national bank. Beginning with the principle that the federal government is one of enumerated powers, Chief Justice Marshall conceded that there is no constitutional provision expressly granting Congress the power to charter a bank. He observed, however, that Article I, § 8 gave Congress the power "to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war ..." 17 U.S. at 408. Implied in this express grant of authority, he held, was the grant of such further authority as is necessary "to facilitate its execution." *Id.* at 408. The textual source of these implied powers he located in the Necessary and Proper Clause.

Turning to the construction of that clause, the Chief Justice rejected the state of Maryland's argument that the term "necessary" should be construed strictly. Rather, he wrote:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional.

*Id.* at 421.

More recently, the Supreme Court has characterized the scope of the lawmaking power created by the Necessary and Proper Clause as "expansive." *INS v. Chadha*, 462 U.S. 919, 983, 103 S.Ct. 2764, 2804, 77 L.Ed.2d 317 (1983). This is true, in part because, as Justice Marshall wrote in 1819:

> [T]he sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people.

17 U.S. at 421. In 1983, in *Chadha*, the Supreme Court considered our constitutional history since *M'Culloch* and found that:

It is long-settled that Congress may "exercise its best judgment in the selection of measures, to carry into execution the constitutional powers of the government," and "avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances."

462 U.S. at 983, 103 S.Ct. at 2801 (quoting *M'Culloch*, 17 U.S. at 415–16, 420); *see also Hodel v. Virginia Surface Mining*, 452 U.S. 264, 276–77, 101 S.Ct. 2352, 2360–61, 69 L.Ed.2d 1 (1981); *Oregon v. Mitchell*, 400 U.S. 112, 286, 91 S.Ct. 260, 345, 27 L.Ed.2d 272 (1970) (concurring opinion); *Hanna v. Plumer*, 380 U.S. 460, 472, 85 S.Ct. 1136, 1144–45, 14 L.Ed.2d 8 (1965). Thus, one modern commentator has written:

In practice, the Supreme Court will accord the more democratic branches of the federal government great deference ... So long as it would be reasonable for the Congress to view a problem as connected to one of the Constitution's grants of power, the law will be upheld, unless Congress' power is limited by the Bill of Rights or other specific restrictions.

\*　　\*　　\*　　\*　　\*　　\*

Today the test for validity of a federal act is whether the Congress might reasonably find that the act relates to one of the federal powers. So long as the act bears some reasonable relationship to a grant of power to the federal government, the law must be upheld; if the act arguably relates to such an end, then it is valid so long as it does not violate a specific check on governmental actions such as those contained in the Bill of Rights.

Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 3.3, at 307–09 (2d ed.1992). *See also* Tribe, *American Constitutional Law*, § , 5–3, at 301 ("The exercise by Congress of power ancillary to an enumerated source of national authority is constitutionally valid, so long as the ancillary power does not conflict with external limitations such as those of the Bill of Rights and of federalism.").

In this case, the purpose of the Westfall Act as it applies to members of Congress is legitimate. The court recognizes that there are no Congressional findings directly addressing the perceived need to expand the immunity afforded by the Speech or Debate Clause, but such findings are not required. *See United States v. Lopez*, 514 U.S. 549, 561–63, 115 S.Ct. 1624, 1631, 131 L.Ed.2d 626 (1995). Rather, in contrast to *Lopez*, the legitimate basis for the legislation at issue is "visible to the naked eye." *Id.* at 563, 115 S.Ct. at 1632.[11]

As the Supreme Court has recently written: "In cases involving prosecutors, legislators, and judges [it has] repeatedly explained that immunity serves the public interest in enabling such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability." *Clinton v. Jones*, —— U.S. ——, ——, 117 S.Ct. 1636, 1643, 137 L.Ed.2d 945 (1997). In essence, " 'The point of immunity for [public] officials is to forestall an atmosphere of intimidation that would conflict with their resolve to perform their designated functions in a principled fashion.' " *Id.* (quoting *Ferri v. Ackerman*, 444 U.S. 193, 204, 100 S.Ct. 402, 409, 62 L.Ed.2d 355 (1979)).

The cases previously cited which held that neither the Speech or Debate Clause nor the judicially crafted concept of absolute, official immunity applied to the statements of Senators or Representatives made outside of Congress demonstrate that there is a rational basis for extending that immunity by legislation. "[A] primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents. Such service necessarily includes informing constituents and the public at large of issues being considered by Congress." *Williams*, 71 F.3d at 507. Similarly, there is plainly a public interest in having Senators and Repre-

---

**11.** In *Lopez*, the Supreme Court struck down the Gun–Free School Zones Act because that statute no bore no "visible" relation to interstate commerce and thus could not be sustained as a valid exercise of Congressional power pursuant to the Commerce Clause. 514 U.S. at 563–69, 115 S.Ct. at 1632–34.

sentatives with expertise on certain issues communicate their views to officials of the Executive Branch with related responsibilities.

Nevertheless, prior to the Westfall Act it was properly held that Senator William Proxmire could be sued for defamation based on a press release announcing the presentation of his "Golden Fleece Award," which was intended to publicize what he perceived to be egregious examples of wasteful government spending, to a researcher who was funded to study why monkeys clench their jaws. *Hutchinson,* 443 U.S. at 114–17, 133, 99 S.Ct. at 2677–79, 2687. Similarly, prior to the Westfall Act Congressman Jack Brooks was found subject to suit for stating in a television interview that public funds should not be appropriated to pay a private fundraiser for a battleship restoration project in his district. *Williams,* 945 F.2d at 1323–24, 1330. In addition, lacking legislated immunity, Congressman Don Sundquist was deemed potentially liable for libel based on letters he sent to the Attorney General and the Legal Services Corporation complaining about the performance of a publicly funded program in his district. *Chastain,* 833 F.2d at 312–13.

In view of the foregoing, it was reasonable for Congress to conclude that its members would be aided in their effort to inform their constituents, to provide leadership on issues of public importance and, in the process of being more candid and forthcoming, to be more readily accountable to those who elected them if they were not inhibited by the threat of lawsuits and liability for the statements they made outside of Congress in performing these functions.

The Supreme Court and lower courts have generally assumed that it is permissible for Congress and the President to enact legislation expanding their own immunity, and the exercise of the authority to expand the constitutional protection of members of Congress has been upheld in the only case directly addressing the issue. *See Clinton,* —— U.S. at ——, 117 S.Ct. at 1652; *Williams,* 945 F.2d at 1331; *Chastain,* 833 F.2d at 327; *United States v. Maryland,* 488 F.Supp. at 356–57, 636 F.2d at 74. More specifically, in *Clinton,* in rejecting the argument that the

President is entitled to constitutional immunity while in office for civil suits arising out of his unofficial acts, the Supreme Court stated that "[i]f Congress deems it appropriate to afford the President stronger protection" against the risk of burdensome and vexatious litigation, "it may respond with appropriate legislation." *Clinton,* —— U.S. at ——, 117 S.Ct. at 1652.

Similarly, in *Williams,* the Court of Appeals for the Fifth Circuit, in holding that members of Congress were not entitled to common law immunity for defamatory statements made outside the legislative chambers, stated:

> We are in any event powerless under [*Doe v.*] *McMillan* to expand official immunity as Congressman Brooks requests. We also observe that members of the legislative branch, unlike members of the other coordinate branches of the federal government, have the unique power to pass a law giving themselves immunity from suit. Accordingly, it may be appropriate that any grant to them of more expansive absolute immunity than that already written into the Constitution come about by legislation rather than by judicial decision.

945 F.2d at 1331.

The Court of Appeals for the District of Columbia Circuit also declined to expand legislative immunity judicially in part because:

> Unlike members of the executive or judicial branches, members of Congress have the unique ability to enact legislation. In this capacity, congressional power could be hypothesized to exist to enact legislation immunizing members of Congress from common law torts.
>
> \*  \*  \*  \*  \*  \*
>
> If members of Congress in fact believe they require the protection of official immunity, let them so declare and stand accountable to the people for their action.

*Chastain,* 833 F.2d at 327.

Both the Courts of Appeals for the Fifth and District of Columbia Circuits recognized that a statutory expansion of legislative immunity might be subject to constitutional attack. *Williams,* 945 F.2d at 1331 n. 9

("Whether, or in what circumstances, such a grant of immunity could constitutionally override state defamation law is perhaps another question."); *Chastain,* 833 F.2d at 327 ("We have no occasion to judge whether such a power, if asserted, would pass constitutional muster."). However, in its second *Williams* decision, the Court of Appeals for the Fifth Circuit enforced the Westfall Act and barred the plaintiff's defamation action against Congressman Brooks without addressing, let alone deciding, whether the legislation was unconstitutional as applied. 71 F.3d at 506–07.

The general power of Congress to expand the protection of its members by statute was explicitly recognized in *United States v. Maryland,* 488 F.Supp. at 356–57, 636 F.2d at 74. That case involved the constitutionality of a federal law exempting a member of Congress from taxation by any state in which he or she maintained a residence for the purpose of attending to the member's duties in Washington, D.C. In an opinion adopted by the Court of Appeals for the Fourth Circuit, 636 F.2d 73, the district court held the statute to be constitutional because Article I, § 1 vested the power to legislate in Congress and the statutory exemption from certain state taxation was a permissible exercise of the authority of Congress, expressly established by the Necessary and Proper Clause, to decide what laws are appropriate to facilitate the exercise of its power to legislate. *Maryland,* 488 F.Supp. at 356–57.

The instant case, however, presents a question not implicated in *Maryland*—the question whether, as Operation Rescue contends, the Speech or Debate Clause not only defines but also limits the scope of immunity that members of Congress may receive for their statements and, therefore, prohibits a statutory expansion of that immunity. As indicated earlier, the Speech or Debate Clause does not constitute such a prohibition.

The Speech or Debate Clause does not expressly prohibit legislation expanding the scope of immunity it affords. It merely states that members of Congress cannot be questioned elsewhere for what they say in either House. U.S. Const. art. I, § 6, cl. 1. Nor does the Speech or Debate Clause implicitly manifest an intent to prohibit such legislation.

Rather, the architecture of Article I indicates that it would be improper to interpret the Speech or Debate Clause as a limitation on the power of Congress to act under the Necessary and Proper Clause. In rejecting the state of Maryland's narrow interpretation of the Necessary and Proper Clause in *M'Culloch,* Chief Justice Marshall noted that, "The clause is placed among the powers of Congress, not among the limitations on those powers." 17 U.S. at 419. As this observation reflects, when enacted in 1789, the Constitution included a series of express limitations on the power of Congress to legislate. *See* U.S. Const. art. I, § 9. These limitations range from prohibiting interference with the importation of slaves until 1808 to prohibiting the granting of any title of nobility. *Id.* These express prohibitions do not include any limitation on the power to expand by statute the immunity conferred by the Speech or Debate Clause.

The fact that the prohibition that Operation Rescue claims to exist is not expressly included in Article I, § 9 is illuminating, but not dispositive. As James Madison explained in *The Federalist* No. 44, the constitutional convention neither attempted a positive enumeration of all of the powers necessary and proper to effectuate the authority explicitly granted to the federal government nor attempted to enumerate all of the particular powers not necessary and proper for executing the general powers delegated to the national government. *See The Federalist* No. 44, at 129. Rather, the Founders established a system which would, with some exceptions that came to include those later expressly included in the Bill of Rights, allow citizens, through their representatives, to decide based on experience gained as our nation evolved what laws were necessary and proper to sustain the vitality of the democratic government established by the Constitution—subject to judicial review to assure that power was not abused.

As described earlier, it is "long-settled," *Chadha,* 462 U.S. at 983, 103 S.Ct. at 2801, that judicial deference is due to Congress in

deciding what measures are necessary and proper, and those decisions should not be invalidated unless they violate some specific constitutional check on that power, such as a provision of the Bill of Rights or one of the prohibitions of Article I, § 9. *See* Rotunda & Nowak, *Treatise on Constitutional Law,* § 3.3, at 309. As noted earlier, the plaintiff bears the burden of demonstrating that such a prohibition exists. *Rogers,* 123 F.3d at 37. Operation Rescue has failed to satisfy this burden. Thus, under established standards, its claim of unconstitutionality fails.

The court has considered, however, whether the usual deferential standard of review ought to be heightened where, as here, it may be argued that the legislation at issues serves the personal interests of those who have enacted it. No precedent for heightened scrutiny in such circumstances has been cited. In addition, there are significant reasons not to apply a heightened standard of review in this case.

■■■ It has been held that the official immunity created by the Speech or Debate clause does not exist "simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *Brewster,* 408 U.S. at 507, 92 S.Ct. at 2535.[12] This is also true of the extension of that immunity to statements by a Senator or Representative, concerning pending legislation, made outside of Congress because official immunity is generally "an expression of a policy designed to aid in the effective functioning of government." *Barr v. Matteo,* 360 U.S. 564, 572, 79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434 (1959).

Moreover, members of Congress cannot usually expand their own immunity unilaterally. The enactment of legislation generally requires the concurrence of Congress and the President. U.S. Const. art. I, § 7, cl. 2 and 3 (prescribing that to be enacted, legislation must be passed by the House and the Senate and signed by the President, unless a Presidential veto is overridden by two-thirds of each House of Congress).

Nor can members of Congress expand their own immunity with any assurance of impunity. Congress and the President "stand accountable to the people for their action." *Chastain,* 833 F.2d at 327. They must face the voters, who are the ultimate source of their power to legislate and, indeed, to remain in office. The court recognizes that recently few incumbent members of Congress have been voted out of office. However, as Justice Benjamin Cardozo observed, "[t]he utility of an external power restraining the legislative judgment is not to be measured by counting the occasions of its exercise." Benjamin N. Cardozo, *The Nature of the Judicial Process* 92 (Yale Univ. Press 1921). The longstanding and enduring reticence of members of Congress to vote themselves a pay raise despite the many years of inflation that have eroded the value of their salaries is but the most recent reminder that the power of a dissatisfied citizenry to replace their representatives continues to restrain legislative judgment con-

---

12. For essentially the same reason, plaintiffs' claim that the Westfall Act as applied to members of Congress violates Article I, § 6, cl. 2 of the Constitution is without merit. That provision prohibits a Senator or Representative, during his current term, from being appointed to any civil office under the authority of the United States which was created during that term, or the "emoluments" of which were increased during that term. This prohibition is rooted in "a fear that corruption would result if the legislature multiplied the number or increased the salaries of public offices for the benefit of its own members." *Atkins v. United States,* 214 Ct.Cl. 186, 556 F.2d 1028, 1070 (1977). *See also Signorelli v.. Evans,* 637 F.2d 853, 859–62 (2d Cir.1980). The Westfall Act, however, creates no new office. Nor does it increase the "emoluments" of a member of Congress' office because official im-

munity is not an "emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government." *Barr,* 360 U.S. at 572, 79 S.Ct. at 1340.

Similarly, the Westfall Act does not violate the Twenty Seventh Amendment, which prohibits a Senator or Representative from receiving the benefit of legislation providing additional compensation for his or her service until after being reelected. U.S. Const. amend XXVII. The immunity conferred by the Westfall Act is not "compensation." As indicated above, official immunity does not exist "simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *Brewster,* 408 U.S. at 507, 92 S.Ct. at 2535.

cerning matters that directly affect members of Congress.

Our constitution establishes a government which derives its power from the people. Congress is generally authorized to enact legislation that it believes is appropriate to facilitate the performance of its duties. The Westfall Act, as applied to members of Congress, is such legislation. Courts may not properly invalidate legislation deemed necessary and proper by Congress unless it violates a specific prohibition—express or clearly implied—in the Constitution. The Speech or Debate Clause is not such a prohibition. Thus, the court must defer to the judgment of Congress. Members of Congress must stand accountable to the people for their action in extending their own immunity and, in view of the Westfall Act, for any defamatory statements they make in discharging their duties.

## IV. *ORDER*

In view of the foregoing, it is hereby ORDERED that:

1. Plaintiff's motions to REMAND are DENIED;

2. Defendant's motion to dismiss is ALLOWED; and

3. This case is DISMISSED.